UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| JOHN DOE, | : | |
| | : | **Civil Action No:** |
| Plaintiff, | : | |
| | : | 1:15-cv-4354-RWS |
| -against- | : | **Jury Trial Demand** |
| | : | |
| THE BOARD OF REGENTS OF THE | : | |
| UNIVERSITY SYSTEM OF GEORGIA, | : | |
| GEORGE P. "BUD" PETERSON, | : | |
| individually and as agent of the Georgia | : | |
| Institute of Technology, PETER | : | |
| PAQUETTE, individually and agent of | : | |
| the Georgia Institute of Technology, | : | |
| JOHN M. STEIN, Individually and as | : | |
| agent of the Georgia Institute of | : | |
| Technology, RETA PEKOWSKY, as | : | |
| agent of the Georgia Institute of | : | |
| Technology, | : | |
| | : | |
| Defendants. | : | |

## BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Plaintiff John Doe ("Plaintiff")[1] respectfully requests that this Court grant a preliminary injunction pursuant to Fed. R. Civ. P. 65(a) enjoining Defendants from enforcing a decision to expel Plaintiff from the Georgia Institute of Technology ("Georgia Tech" or the "Institute")[2] and allowing him to enroll in and attend the classes that he needs to complete his undergraduate degree when the spring semester begins on January 11, 2016.  Given the urgency of this motion, Plaintiff respectfully requests an expedited briefing and hearing schedule.

## FACTUAL BACKGROUND

The factual background underlying Plaintiff's Motion is detailed in full in Plaintiff's Verified Complaint filed with the Court on December 15, 2015, which is incorporated in its entirety as if fully restated here and briefly summarized below.

Plaintiff matriculated at Georgia Tech in the fall of 2011, with the intention of pursuing a degree in aerospace engineering.  Plaintiff has maintained a 3.1 GPA and become a campus leader while participating in the Georgia Tech Marching and

---

[1] Plaintiff has simultaneously filed a motion to proceed pseudonymously due to the nature of the allegations in the complaint.  Plaintiff is proceeding under the name "John Doe" and has identified his accuser as "John Roe."

[2] Board of Regents of the University System of Georgia ("the Board of Regents") oversees Georgia Tech.  The Board of Regents is the legal entity that must sue, or can be sued, in place of Georgia Tech.  *Bd. Of Regents of the Univ. Sys. of Ga. V. Doe,* 278 Ga. App. 878 (2006).  For ease of reference, Plaintiff has referred to the Board of Regents and Georgia Tech interchangeably.

Pep Bands. In addition, Plaintiff joined the band fraternity Kappa Kappa Psi. It was through these organizations that Plaintiff met John Roe.

Roe is a homosexual male. In early March 2014, Plaintiff ended a serious romantic relationship with his boyfriend. Approximately two to three weeks after Plaintiff broke up with his boyfriend, Roe told Plaintiff that he had feelings for him and that he wanted to pursue a romantic relationship. Plaintiff advised Roe that he was still getting over his previous boyfriend, was not ready for a relationship, and that maybe something could happen in the future. The two men continued to hang out together in the days and weeks that followed.

In early to mid-April, Roe invited Plaintiff over to a party that was being hosted by one of Roe's friends. Roe agreed to serve as the designated driver. After dropping his friends off at the conclusion of the party, Roe returned to Plaintiff's house where he spent the night in Plaintiff's bed and the two men engaged in oral sex. Roe left Plaintiff's house the next morning and they continued to hang out together, but did not discuss what had happened or where it would lead.

While Plaintiff and Roe disagree about exactly when the incident (the "Incident") occurred, they do agree that they had a second sexual encounter in or around the end of April 2014. Roe actively participated and demonstrated his consent throughout the evening and morning of the Incident. During the Incident,

the two men performed oral sex on each other on two occasions. Both acts were consensual and in both instances, Roe was sufficiently clear minded and aware of what was going on. No force was involved and Plaintiff had every reason to believe that everything was consensual.

In the days and weeks that followed, Plaintiff had no reason to believe that anything was amiss. Roe's actions following the suggest that his decision to report Plaintiff to the OSI was the result of Plaintiff's unwillingness to pursue a romantic relationship and other events in Roe's life. In fact, Roe never tried to avoid Plaintiff and repeatedly sought out, and engaged in activities involving, Plaintiff. Roe never gave any indication that he was feeling uneasy about what had transpired in April 2014. To the contrary, Roe repeatedly expressed his interest in pursuing a romantic relationship. Plaintiff told Roe more than once that he did not want a romantic relationship and did not want to date him. Eventually, Roe ceased contact with Plaintiff due to jealously and the fact that he was clearly a jilted lover.

Plaintiff was not aware that Roe had any questions or concerns regarding the Incident until he was summoned to meet with Paquette on April 20, 2015--ten days shy of the first anniversary of the Incident. Paquette advised Plaintiff that Roe had filed a complaint alleging Plaintiff had coerced Roe into having sex while Roe was incapable of consenting because he was intoxicated. Paquette's investigation would

prove to be highly flawed and designed to reach the foregone conclusion that Plaintiff had engaged in for sexual misconduct. Paquette failed to provide Plaintiff with a copy of the Policies, or advise Plaintiff of his rights thereunder. Paquette also failed to advise Plaintiff, of among other things, the significance of the charges and potential penalties. Paquette also failed to advise Plaintiff that Roe's claims were not timely filed.

Paquette interviewed Plaintiff, Roe, and six witnesses provided by Roe, between April 15, 2015 and May 7, 2015. Paquette conducted his interviews *ex parte* even though the credibility of Roe and the other witnesses would be a critical factor in the investigation. He also failed to record the interviews or create a transcript. Plaintiff was thus prevented from being able to conduct a meaningful review of the interviews. Instead, Paquette provided written summaries as part of Paquette's final report. The summaries purport to paraphrase the substance of the witness' statements, but fail to identify the he witnesses. The summaries also focus primarily on statements that Roe made months after the Incident. The statements lack any probative value and are highly contradictory. Yet, Paquette relied on these statements to expel Plaintiff. Paquette's reliance on anonymity further circumscribed Plaintiff's ability to challenge the witnesses' version of events.

Paquette also actively took steps to limit Plaintiff's ability to review the statements. Paquette presented a draft of his 13-page, single spaced final report to Plaintiff during a follow-up meeting held on May 1, 2015 at 9:00 a.m. Paquette failed to provide Plaintiff with a copy of the report prior to that meeting even though Paquette knew that Plaintiff had scheduled a counseling session for 10:00 a.m. Paquette then rushed Plaintiff through his review of the report.

In contrast, Paquette re-interviewed Roe on two separate occasions to get Roe's response and appears to have given Roe an open ended period to get his story straight. Paquette's methods ensured that Paquette would be the only person who could make the credibility determinations upon which this case turns. In further violation of Plaintiff's due process rights, Paquette refused to give Plaintiff adequate time to identify and present the names of witnesses to OSI.

Paquette memorialized the results of his investigation in a report entitled "Title IX & Student Sexual Misconduct Policy Final Investigation Report With Outcome" on May 13, 2015 (the "Report"). Paquette concluded that "both the victim and the respondent provide[d] accounts that are reasonable to believe. Specifically, he concluded that "it was reasonable to believe that based on the nonverbal actions of Victim, that Respondent believed he had consent." Nevertheless, Paquette expelled Plaintiff.

Paquette's findings were seriously flawed and represented a blatant disregard for the facts and Plaintiff's right to due process. Paquette failed to interview crucial witnesses and generated a report that relied upon hearsay, innuendo, suppositions, and uncorroborated statements. Moreover, Paquette, and the various entities that would hear both Plaintiff's and Roe's subsequent appeals, ignored numerous instances where Roe changed his story or otherwise made inconsistent statements. Plaintiff appealed Paquette's decision to the Appellate Committee (the "Committee"). On June 9, 2015, the Committee "overturned" Paquette's decision based on a lack of evidence. On June 17, 2015, *Roe's parents* filed an appeal with Peterson. The appeal was procedurally improper because (1) the student, rather than the parents, is required to prepare and file the appeal and (2) the appeal was filed one day late. In addition, Roe's parents' appeal was not based on any of the four authorized bases for filing an appeal. Peterson nevertheless opted to consider Roe's parents' appeal.

On July 23, 2015, Peterson reversed the Committee's decision and reinstating Paquette's decision. Apparently using a standard form letter, Peterson stated that the Committee's decision must "be made based on some compelling reason." He then wrongly defined the phrase "compelling reason," ignored the two other bases for appeal, and upheld Plaintiff's expulsion.   Plaintiff appealed

Peterson's decision to the Board of Regents, which vacated Peterson's decision and remanded the case to Georgia Tech. The Board of Regents provided no written explanation or instructions on how Georgia Tech was to proceed on remand. Plaintiff repeatedly requested a detailed written explanation of the Board of Regent's decision, but he received no response. Plaintiff only learned that Peterson had remanded the remand to the Committee. Upon information and belief, the Board of Regents issued verbal instructions to Peterson and/or one or more of his subordinates. But those instructions were not communicated to Plaintiff. Moreover, Plaintiff's repeated requests for information were ignored.

On October 29, 2015, Peterson issued a memo essentially directing Stein and the Committee to find Plaintiff responsible. On November 10, 2015, Plaintiff received a letter advising him that the Committee had reviewed the matter and had recommended that Paquette's decision and sanction be upheld. On November 30, 2015, Peterson once again expelled Plaintiff.

## ARGUMENT

## I.   LEGAL STANDARD FOR A PRELIMINARY INJUNCTION

To obtain a preliminary injunction, a plaintiff:

> must establish the following four elements: (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction is issued; (3) the threatened injury

to the moving party outweighs whatever damages the proposed injunction might cause the non-moving party; and (4) if issued, the injunction would not be adverse to the public interest.

*Cellaris Franchise, Inc. v. Duarte,* 2015 WL 6517487, at *5 (N.D. Ga. Oct. 21, 2015)(punctuation omitted). None of the four factors has a fixed quantitative value. *Texas v. Seatrain Int'l, S.A.,* 518 F.2d 175, 180 (5th Cir. 1975). Consideration of these factors unquestionably support Plaintiff's right to a preliminary injunction preventing Defendants from enforcing their decision to expel Plaintiff from Georgia Tech and allowing him to attend classes when they begin on January 11.

## II.   PLAINTIFF WILL CONTINUE TO SUFFER IRREPARABLE HARM

Georgia Tech has branded Plaintiff as a sex offender and expelled him from the Institute. Plaintiff will suffer irreparable harm as a result of Georgia Tech's wrongful actions. *See Valley v. Rapides Parish Sch. Bd.,* 118 F.3d 1047, 1056 (5th Cir. 1997)("[T]he Board's biased finding of inefficiency and incompetence will inflict such severe injury to her professional reputation that a monetary award would likely be inadequate and almost certainly speculative."); 11A Charles Alan Wright, et al., Federal Practice and Procedure § 2948.1 (3d ed. 1998)("Injury to reputation or goodwill is not easily measurable in monetary terms, and so often is viewed as irreparable."). Plaintiff has also suffered emotionally as a result of

Georgia Tech's actions in wrongfully branding him as a sex offender. *See, e.g., Caspar v. Snyder,* 77 F. Supp. 3d 616, 640 (E.D. Mich. 2015)(noting "loss of dignity and other emotional injury . . .not susceptible to quantitative calculation.").

Plaintiff is also facing irreparable injury to his educational career. Plaintiff was expelled with only seven courses left to complete his degree in aerospace engineering. As a result, Plaintiff's ability to begin work in his chosen profession has been delayed by a minimum of seven months because he was scheduled to graduate in May 2016. As the Fourth Circuit has explained, these actions will "delay[] the time at which [his] ability to work . . . will come to fruition; [he] will have a gap in [his] education which [he] will be forced to explain through [his] professional life; and [he] will be deprived of the opportunity to complete [his] education with [his] fellow classmates." *Jones v. Bd. Of Governors of Univ. of North Carolina,* 704 F.2d 713, 716 (4th Cir. 1983).

In addition, Georgia Tech is revising the curriculum for its aerospace engineering program. The Spring 2016 will be the last semester in which Georgia Tech offers the following courses: AE 3125 (Structures), AE 3051 (Fluids Lab), AE 3145 (Structures Lab), and AE 3021 (High Speed). The Fall 2016 semester will be the last time that Georgia Tech offers AE 4357 (Senior Design 2). In addition, successful completion of AE 3125 is a prerequisite to enrolling in AE 4220 (Aero

elasticity), another course that Plaintiff must complete to graduate. Thus, if Plaintiff is not allowed to resume his studies in January 2016, he will be unable to complete his undergraduate studies at Georgia Tech regardless of the outcome here.

## III.   INJUNCTIVE RELIEF RISKS NO HARM TO OTHERS

While the Institute has an institutional interest in quickly resolving disciplinary charges and maintaining confidence in the integrity of its processes, that interest is limited by the fact that a student will often suffer a far more substantial and concrete injury if an injunction is wrongly withheld than the Institute will suffer if the injunction is wrongly granted. *Jones,* 704 F.2d at 716. Plaintiff has amply demonstrated that the Defendants committed grave and serious violations of Plaintiff's due process rights. Plaintiff's injuries are concrete, while Georgia Tech's are speculative. Staying the expulsion order and directing his enrollment beginning with the Spring 2016 semester, will mitigate the concrete injury that Plaintiff has already suffered, and Plaintiff is willing to accept any reasonable restrictions that may be imposed. In contrast, the Institute cannot articulate anything more than generalized or speculative harm. Given that the courses Plaintiff needs to graduate will not be offered after 2016, it is imperative that Plaintiff be allowed to return to school. Plaintiff is facing concrete and far-reaching injuries. The Institute's injuries are speculative and do not justify barring

Plaintiff from attending classes while the Court endeavors to resolve this dispute.

## IV.  THERE IS A LIKELIHOOD OF SUCCEEDING ON THE MERITS

### A. Due Process

A public educational institution may not expel a student for misconduct (or even suspend him for as few as ten days) "without adherence to the minimum procedures required by [the Due Process] Clause." *Goss v. Lopez,* 419 U.S. 565, 573-74 (1975). In *Goss v. Lopez*, the Court held that a student was entitled to due process because the student had both a protected property interest in public education under state law, and a "liberty interest in reputation." *Id.* at 576. Due process requires an impartial decision maker, an opportunity to be heard, and where important decisions turn on questions of fact, an opportunity to confront and question adverse witnesses. Here, the Institute denied Plaintiff these fundamental rights from the outset when it failed to provide Plaintiff with notice of the charges against him. Defendants' egregious conduct continued throughout the process when Defendants' did nothing more than allow Plaintiff to discuss his version of the facts in an informal interview. *See Dixon v. Alabama State Bd. of Educ.,* 294 F.2d 150, 159 (1961)(requiring notice, containing statement of charges and grounds for expulsion, and opportunity to be heard in more than informal interview for procedural due process in expulsion).

### 1.  The Opportunity to Be Heard

"A fundamental requirement of due process is the opportunity to be heard." *Armstrong v. Manzo,* 380 U.S. 545, 552 (1965). The decision makers, however, must also be willing to listen. *See, e.g., Carter v. Harris,* 64 F. Supp. 2d 1182, 1189 (M.D. Ala. 1999). Defendants made no effort to listen to Plaintiff. Paquette did not offer Plaintiff an opportunity to provide a list of witnesses, yet went out of his way to speak with Roe's witnesses. Paquette was focused on one goal—finding Plaintiff responsible and expelling him.

It is well settled that "a body that has prejudged the outcome cannot render a decision that comports with due process." *Bakalis v. Golembeski,* 3 F.3d 318, 326 (7th Cir. 1994); *see also D'Angelo v. Winter,* 403 F. App'x 181, 182 (9th Cir. 2010). Yet, that is precisely what Defendants repeatedly did.

### 2.  The Opportunity to Confront and Cross-Examine Witnesses

Paquette's decision ostensibly turned on a finding that Roe's version of events was more credible than Plaintiff's, yet Defendants denied Plaintiff any means of confronting his accuser and Paquette's "informants." The Supreme Court has held that "in almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Goldberg v. Kelly,* 397 U.S. 254, 269 (1970). Where a school

disciplinary hearing turns almost entirely on the complainant's credibility, universities must give students the right to challenge adverse testimony during the disciplinary proceedings. *See, e.g., Winnick v. Manning,* 460 F.2d 545, 550 (2d Cir. 1972). As the *Winnick* court explained, in cases in which the question of student discipline turns on a question of credibility, and the decision maker has to choose between either the accused or his accuser, "cross-examination might … [be] essential to a fair hearing." *Id.* at 550; *see also Donohue v. Baker*, 976 F. Supp. 136, 146-47 (N.D.N.Y 1997)("[I]n light of the disputed nature of the facts and the importance of witness credibility. . . in this case, due process required that the panel permit the [accused student] to hear all evidence against him and to direct questions to his accuse through the panel."); *Dillon v. Pulaski Cnty Special Sch. Dist.,* 468 F. Supp. 54, 58 (E.D. Ark. 1978).

By Paquette's own admission, Plaintiff's case came down to a question of credibility, and Paquette had found both Plaintiff's and Roe's version of events "reasonable to believe." Yet Paquette refused to allow Plaintiff to question Roe or Roe's witnesses even indirectly through Paquette. Paquette's refusal to provide this basic due process protection was further compounded by Paquette's failure to disclose the exact questions that he asked the witnesses and what they said in response, or to memorialize his meetings with those witnesses by recording or

transcribing them. Paquette has recently testified under oath that he chooses what to include and exclude in his written summaries, so no one other than Paquette has any way to determine exactly on what Paquette based his credibility decisions. To this day, Plaintiff has been denied the fundamental right to know the names of the "informants" Paquette relied upon in expelling Plaintiff. Georgia Tech's system of justice denied Plaintiff his right to confront his accusers, and Defendants thus denied Plaintiff his right even the most rudimentary requirements of due process.

### 3.  The Right to an Impartial Decision Maker

The Fourteenth Amendment's Due Process Clause also requires an impartial decision maker. *See, e.g., Goldberg v. Kelly,* 397 U.S. 254, 271 (1970). In the context of a student disciplinary proceeding, "the providing of a fair and impartial tribunal imposes [no] great administrative burden on the school." *Furey v. Temple Univ.,* 730 F. Supp. 2d 380, 395 (E.D. Pa. 2010).  In *Furey*, the court denied Temple's motion for summary judgment with respect to plaintiff's due process claim because a member of the student disciplinary panel had a "friendship" with the complainant. The *Furey* court reasoned that "[t]he plaintiff's interest in avoiding expulsion is great, as is the benefit of an impartial panel in safeguarding against an erroneous decision." *Id.*

Paquette was anything but an impartial decision maker as evidenced by his

report, which gave short shrift to any effort to determine what actually happened that night or why Roe waited almost an entire year to file his complaint with the OSI. Paquette repeatedly ignored the ample evidence that demonstrated that Roe filed his complaint only after it became clear that Plaintiff was not interested in pursuing a romantic relationship with Roe and that Roe's story repeatedly changed. Instead, Paquette focused on any evidence that would impugn Plaintiff's character, and relied on hearsay and gossip that was irrelevant to the question that Paquette was charged with determining. Paquette's methods and actions tainted not only his findings, but also any subsequent review. Defendants Peterson and Stein then went out of their way to ensure Plaintiff's expulsion when the Committee had the temerity to reverse Paquette's decision. Peterson was equally heavy handed when he issued instructions regarding how Stein and the Committee should consider the appeal after the Board of Regent's vacated Peterson's decision to reinstate Paquette's original finding. Defendants violated the plain language of Georgia Tech's Sexual Misconduct Policy and they can hardly be deemed impartial arbiters.

### B. Gender Discrimination

Plaintiff has asserted several claims against the Institute, each of which is likely to succeed. Georgia Tech failed to follow its own guidelines and procedures in investigating Roe's claims and expelling Plaintiff. Equally significant, the

guidelines and procedures are fatally flawed and facilitate the complete absence of due process for the accused male student. This is a direct violation of Title IX of the Education Amendments of 1972 and state law. *Yusuf v. Vassar College,* 35 F.3d 309 (2d Cir. 1994)("Looking to these analogous bodies of law, we may safely say that Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline.").

Courts have held that the failure to set forth a detailed factual finding in the college's disciplinary determination is tantamount to a failure of due process. *Boyd v. SUNY Cortland*, 2013 NY Slip Op. 06751 (3d Dep't 2013)("In a disciplinary proceeding at a public institution of higher education, due process entitles a student accused of misconduct to 'a statement detailing the factual findings and the evidence relied upon by the decision-maker in reaching the determination of guilt'").

While Paquette's report is 13 pages long, 12 of those pages represent Paquette's paraphrasing of his witness interviews. Those interviews are filled with hearsay, innuendo, and other prejudicial information that has nothing to do with Roe's claims. Moreover, Paquette devotes less than half a page of "analysis" to those interviews even though the charges against Plaintiff called for the imposition of an academic death penalty if Plaintiff was found responsible. Paquette's analysis

was seriously flawed, with many of the supposedly agreed upon issues, such as Roe's level of alcohol consumption, in dispute. Paquette then proceeded to issue a fourteen-line decision expelling Plaintiff for violating the Institute's non-consensual sexual intercourse provision even though Paquette had found that both Plaintiff's and Roe's version of events were reasonable to believe. Defendants' decisions on the various appeals would similarly be bereft of any substantive analysis or explanation as to how the appeals were decided.

A college's failure to provide a detailed factual finding forecloses the accused student's ability to "effectively challenge the determination in administrative appeals and in the courts and to ensure that the decision was based on evidence in the record." *See, e.g., Matter of Kalinsky v. State Univ. of N.Y.,* 161 A.D.2d at 1007. Here, Plaintiff was denied the effective assistance of any advisor and cross-examination of his accuser and the anonymous witnesses was effectively denied. Moreover, Plaintiff was denied the opportunity to offer witnesses on his behalf and to develop a means of recovering the deleted Facebook messages, which would have conclusively demonstrated that Roe's version of those messages had been heavily edited in an effort to frame Plaintiff. Similarly, Defendants failed to give Plaintiff written notice of the basis for the Institute's investigation and the charges against him prior to his initial meeting with Paquette.

Moreover, Plaintiff will establish a plausible inference that Georgia Tech's actions are a result of gender bias. Georgia Tech's actions are part of a larger reaction to the intense scrutiny that it has received regarding the behavior of its male students since the October 2013 Georgia Tech fraternity email entitled "Luring Your Rapebait." That email resulted in national outrage over its content, the treatment of sexual partners by men, and fraternities. Berkowitz Decl. Ex. A, B, attached as Exhibit 1. After the resulting scandal, Georgia Tech changed its disciplinary policies and, according to a study conducted by the *Atlanta Journal-Constitution*, "students accused at Georgia Tech [are now] almost always found responsible." Berkowitz Decl. Ex. C.

After the scandal, OSI, under the direction of Paquette, began rigging the disciplinary process with the goal of making sure that male students and student organizations are found responsible. In 2015, for example, a fraternity being investigated by OSI complained that Paquette "steadfastly refused to interview any of [the fraternity's] witnesses, or review [the fraternity's] evidence, or conduct an investigation that might support [the fraternity's] position." Paquette, however, repeatedly met with the complainant. Likewise, when OSI investigated a complaint filed against a male Georgia Tech athlete, it reportedly refused to interview key witnesses who saw both parties immediately after the incident. Significantly, the

OSI refused to investigate the male respondent's claim that the female complainant had straddled and kissed him while he was unconscious. The respondent's claims were corroborated by multiple witnesses, but the OSI refused to even consider his case.

These decisions only serve to confirm that Plaintiff's gender was a motivating factor in the investigation and adjudication of Roe's complaint. *Wells v. Xavier Univ.,* 7 F. Supp. 3d 746, 751 (S.D. Ohio 2014)(refusing to dismiss plaintiff's "erroneous outcome" challenge because of allegations that "defendants were reacting against [the respondent], as a male, to demonstrate to the [U.S. Department of Education's Office of Civil Rights] that Defendant would take action, as they have failed to in the past, against males accused of sexual assault.").

Paquette's past endorsement of the book *Guyland* in previous disciplinary cases strongly suggests that Plaintiff's gender was a motivating factor in Paquette's decision. As detailed in the Berkowitz Decl., Paquette has previously required male students that he has disciplined to read and write a paper regarding *Guyland*. The book purports to examine "mostly white, middle-class kids ... [that] live communally with other guys, in dorms, apartments or fraternities." *See* Michael Kimmel, *Gulyand: The Perilous World Where Boys Become Men* (2009). According to Kimmel, "Greeks and jocks live at the epicenter of Guyland." *Id.* at

233. Kimmel argues that intensive, all-male peer groups foster rape-supportive behaviors and attitudes. *Id*. at 237. He also argues that "athletes or frat guys are more prone to gang rape … because being frat guys or athletes confers on them an elite status that is easily translated into entitlement, and because the cement of their brotherhood is intense, and intensely sexualized, bonding." *Id*. at 239.

Plaintiff's fraternity membership when coupled with Paquette's endorsement of *Guyland*, with its slanted gender bias, suggests that gender bias was a motivating factor behind his erroneous finding. *Yusuf*, 35 F.3d at 715; *see also Doe v. Washington & Lee Univ.,* 2015 WL 447996, at *10 (W.D. Va. Aug. 5, 2015) (inferring gender bias from presentation given by university's Title IX Coordinator that endorse article, *Is It Possible That There is Something in Between Consensual Sex and Rape . . . And That It Happens to Almost Every Girl Out There?).*

## C. STATE LAW CLAIMS

Defendants' actions also form the basis for state law claims that have a substantial likelihood of success on the merits: breach of contract and negligence.

### 1. Breach of Contract/Breach of the Covenant of Good Faith and Fair Dealing

Plaintiff's relationship with the Institute is contractual, and the Code of Conduct, Sexual Misconduct Policy, and other materials published by Georgia

Tech form the terms of the contract. *See, e.g., Morehouse College, Inc. v. McGaha,* 277 Ga. App. 529, 531 (2005). While *Morehouse* involves a private educational institution, there is no reason to believe that if a Georgia court confronted with a similar case arising from a public educational institution, would reach a different conclusion. Moreover, courts in other states have repeatedly recognized the contractual relationship between a public university and its students. *See, e.g., Savoy v. Univ. of Akron,* 15 N.E.3d 430, 436 (Ohio Ct. App. 2014)("When a student enrolls in a college or university, pays his or her tuition and fees, and attends such school, the resulting relationship may reasonably be construed as being contractual in nature."); *Dixon v. Alabama,* 294 F.2d 150, 157 (5th Cir. 1961).

Defendants repeatedly breached the contract between Georgia Tech and Roe. First, the Student Code of Conduct states that "[a]ny person may file a complaint against a Student for violations of the Student Code of Conduct," which include a "[v]iolation of the Georgia Institute of Technology Sexual Harassment & Misconduct Policy." Berkowitz Decl. Ex. D at 7. That same Code states that "[t]his complaint should be submitted . . . no later than thirty (30) business days following the discovery of the incident." *Id.* Yet, Defendants allowed Roe to submit the complaint almost one year after the alleged incident.

Second, the Sexual Misconduct Policy contemplates four bases for appeal:

- Whether the original investigation was conducted fairly and in conformity with prescribed procedures;
- Whether there was sufficient evidence to support the decision;
- Whether the Sanctions and Supplementary Requirements imposed were appropriate for the violation for which the Student was found responsible; and
- Whether new information, not available at the time of the investigation, is relevant to the final decision.

Sexual Misconduct Policy at 10. Yet, Peterson cited only two of these categories and failed to consider whether Paquette's investigation was fair, whether there was sufficient evidence to support the decision, and whether Plaintiff's expulsion was an appropriate sanction.

Finally, "every contract imposes upon each party a duty of good faith and fair dealing in the performance of their respective duties and obligations." *TechBios, Inc. v. Champagne,* 301 Ga. App. 592, 593 (2009); *see also* Restatement (Second) of Contracts § 205 (1981). As a result, when "the manner of performance of is left more or less to the discretion of one of the parties to the contract, he is bound to the exercise of good faith." *Gladstein v. Aurora Loan Servs.,* LLC, 2012 WL 3758160, at *9 (N.D. Ga., Aug. 2, 2012).

Part and parcel of Plaintiff's decision to accept admission and make tuition payments to Georgia Tech was his expectation that Georgia Tech would, at the very least, uphold its own rules, regulations, and guidelines set forth in the Student

Code of Conduct and the Sexual Misconduct Policy and not discriminate based on his gender or sexual orientation. Defendants' actions were one-sided toward Roe and pre-determined Plaintiff's guilt. Whenever an arm of Georgia Tech, such as the Committee got in the way, and actually tried to evaluate the evidence, the individual Defendants stepped in to undue those efforts. These defendants even flaunted the authority of the Board of Regents in how they handled the vacatur of Peterson's original decision by all but directing the Committee to expel Plaintiff. By refusing to review exculpatory evidence or interview exculpatory witnesses, Defendants, failed to exercise good faith in complying with their promise that Plaintiff would have "the opportunity to provide information regarding his . . . involvement in the allegation." Sexual Misconduct Policy at 8.

### 2.  Negligence

Plaintiff will prove that the Institute was negligent in its investigation and adjudication of Roe's claim. In Georgia, the elements of a cause of action for negligence follow the common law and require a plaintiff to establish the existence of a duty, a breach of that duty, causation, and damages. *Campbell v. Wells Fargo,* 2015 WL 5797852, at *9-10 (N.D. Ga. Aug. 12, 2015). In a student disciplinary proceeding, schools have a duty to "refrain from conduct that will foreseeably cause injury to others." *Doe v. Univ. of the South,* 2011 WL 1258108, at *21 (E.D.

Tenn. Mar. 31, 2011). There, the court concluded that "a jury could find that the harm caused by [a] University's allegedly and arguably haphazard implementation of its own Sexual Assault Policies was foreseeable, especially where…the harm was severe: a wrongful conviction by a disciplinary committee." *Id.*

Georgia Tech's one-sided investigation breached the duty it owed to Plaintiff and harmed him. The Institute has a duty to protect all of its students, including protecting individuals from having false allegations of sexual misconduct lodged against them. The damages that Plaintiff has and will continue to suffer as a result of the Institute's rush to validate those claims were foreseeable given that the Institute's Sexual Misconduct Policy imposes a mandatory expulsion penalty. *See* Sexual Misconduct Policy § D.5.D. In validating Roe's false allegations in the face of exculpatory evidence, Georgia Tech came to an erroneous determination that Plaintiff was responsible which resulted in Plaintiff suffering significant damages, including, economic injuries stemming from the delay in starting his professional career and lost internship opportunities, as well as lot educational opportunities.

## V.    INJUNCTIVE RELIEF IS IN THE PUBLIC INTEREST

Granting a preliminary injunction and allowing Plaintiff to complete his education will also serve the public interest. Plaintiff is a Georgia resident and the State has invested significant sums in subsidizing the cost of a college education

for its residents. There are serious doubts surrounding the legitimacy of Defendants' actions in expelling Plaintiff. That fact, when coupled with the fact that Plaintiff does not pose a threat to others strongly suggests that the public interest would best be served by allowing Plaintiff to complete his education while the flawed process that produced his sanction is exposed.

## VI.   BOND SHOULD BE WAIVED BECAUSE DEFENDANT WILL NOT BE HARMED

Finally, Plaintiff moves the Court to waive security for any injunction it issues. In cases where the non-movant has not shown a likelihood of harm, the district court may properly set no bond. *See, e.g., Corrigan,* 569 F.2d at 302-303. An injunction carries no risk of monetary loss to Georgia Tech.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court enter a preliminary injunction enjoining Georgia Tech from enforcing its decision to expel Plaintiff and allowing him to enroll in and attend classes when the spring semester begins on January 11, 2016 and all subsequent semesters during the pendency of the requested preliminary injunction.

**Dated: Atlanta, Georgia**
          **December 15, 2015**

*/s/ Jonathan E. Hawkins*

Jonathan E. Hawkins
Georgia Bar No. 338779
hawkins@khlawfirm.com
Christopher E. Adams
Georgia Bar No. 789600
adams@khlawfirm.com

KREVOLIN & HORST, LLC
1201 W. Peachtree Street, N.W.
Suite 3250, One Atlantic Center
Atlanta, GA 30309
(404) 888-9700
(404) 888-9577 (facsimile)

-and-

Andrew T. Miltenberg, Esq.
(motion for admission *pro hac vice*
to be filed)
Jeffrey S. Berkowitz, Esq.
(motion for admission *pro hac vice*
to be filed)
Nesenoff & Miltenberg, LLP
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
amiltenberg@nmllplaw.com
jberkowitz@nmllplaw.com

*Attorneys for Plaintiff John Doe*

## CERTIFICATION UNDER L.R. 7.1D.

Pursuant to Northern District of Georgia Civil Local Rule 7.1D, the undersigned counsel certifies that this   is a computer document and was prepared in Times New Roman 14 point font, as mandated in Local Rule 5.1C.

This 15th day of December, 2015.