# **<u>Exhibit A</u>**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| JOHN DOE, | : | |
| | : | **Civil Action No:** |
| Plaintiff, | : | **1:15-cv-04354-RWS** |
| | : | |
| -against- | : | **Jury Trial Demand** |
| | : | |
| THE BOARD OF REGENTS OF THE | : | |
| UNIVERSITY SYSTEM OF GEORGIA, | : | |
| GEORGE P. "BUD" PETERSON, | : | |
| individually and as agent of the Georgia | : | |
| Institute of Technology, PETER | : | |
| PAQUETTE, individually and as agent of | : | |
| the Georgia Institute of Technology, | : | |
| JOHN M. STEIN, individually and as | : | |
| agent of the Georgia Institute of | : | |
| Technology, RETA PEKOWSKY, as | : | |
| agent of the Georgia Institute of | : | |
| Technology, | : | |
| | : | |
| Defendants. | : | |

## <u>VERIFIED AMENDED COMPLAINT</u>

Plaintiff John Doe  ("Plaintiff"), by his attorneys Nesenoff & Miltenberg,

LLP, together with Krevolin & Horst, LLC, as and for his Verified Complaint

against the Board of Regents of Georgia Tech System of Georgia, George P. "Bud"

Peterson, individually and as an agent of Georgia Institute of Technology, Peter

Paquette, individually and as an agent of the Georgia Institute of Technology, John Stein, individually and as an agent of the Georgia Institute of Technology, and Reta Pekowsky, in her official capacity as an agent of the Georgia Institute of Technology respectfully alleges as follows:

## THE NATURE OF THIS ACTION

1.    This case arises out of the actions taken and procedures employed by defendants The Board of Regents of University System of Georgia ("Board of Regents") acting by itself and through The Georgia Institute of Technology ("Georgia Tech" or the "Institute"), George P. "Bud" Peterson ("Peterson"), John M. Stein ("Stein"), and Peter Paquette ("Paquette") that resulted in Plaintiff's expulsion from Georgia Tech based on a single investigator's determination that more than one year earlier, Plaintiff engaged in non-consensual sexual intercourse with fellow Georgia Tech student John Roe.  ("Board of Regents," "Georgia Tech" or the "Institute," "Peterson," "Stein," and "Paquette" are sometimes collectively referred to as "Defendants")

2.    On January 4, 2016, approximately three weeks after Plaintiff filed his complaint, and on the eve of the Court hearing oral argument on the Plaintiff's motion for a preliminary injunction, the Board of Regents reinstated Plaintiff and

allowed him to return to class.  The Board of Regents' decision to reinstate Plaintiff rendered his motion for a preliminary injunction moot.

3.      The Board of Regents' decision did not, however, render Plaintiff's damage claims moot or otherwise compensate Plaintiff for the damages associated with his having been forced to miss a semester of school during his wrongful expulsion and resulting delay in Plaintiff's graduation and the start of his career. Nor did the Board of Regent's decision compensate Plaintiff for the damage to his reputation, the public humiliation he suffered when he was escorted from band practice due to his "expulsion" in front of 200 fellow band members, and the emotional distress he suffered, and the attorney's fees he has incurred in seeking his reinstatement.

4.      Plaintiff was only 19 credit hours (that is, 7 classes), short of completing his undergraduate education and receiving his degree in aerospace engineering when he was expelled.  He is an exemplary student who has maintained a 3.1 grade point average at Georgia Tech while actively participating in, and serving in a leadership role in the Georgia Tech Marching and Pep Bands. Plaintiff has always been a leader and a role model both prior to and while a student at Georgia Tech, and has never been in trouble of any kind.

5.     As detailed herein, Defendants' actions reflect a long and tortured history of Defendants' failing to comply with their own policies and procedures and an inherent bias against male college students, and homosexual men in particular, which has resulted in conflicting and ever changing decisions. Defendants' repeatedly violated Plaintiff's right to due process, discriminated against him based on his gender and sexual preference, and failed to comply with the Board of Regents' and Georgia Tech's own procedures.  Defendants' actions have in turn dramatically injured Plaintiff and prevented him from completing his college education on time.

6.     Plaintiff's expulsion was based on what was clearly consensual sexual activity that took place on or about April 30, 2014 (the "Incident") between Plaintiff and John Roe, a fellow student at Georgia Tech at an off-campus house.

7.     Yet, on April 15, 2015, nearly one full year after the Incident, Roe contacted Georgia Tech's Office of Student Integrity ("OSI"), and reported that the Incident was not consensual.   Roe's claim was demonstrably false, as the contemporaneous statements and actions of Roe are inconsistent with his subsequent claim one year later that the encounter was non-consensual.  Roe's subsequent actions and conduct are similarly inconsistent with the idea that the Incident was non-consensual.  Rather, it appears that Roe filed his complaint after

it became clear that Plaintiff was not interested in pursuing a romantic relationship with Roe.

8.     Paquette, who was vested with the sole authority to investigate and adjudicate Roe's claims against Plaintiff, conducted Georgia Tech's investigation. From the outset of his investigation, Paquette abused his authority.  Rather than proceeding in a fair and impartial manner, Paquette set out to find Plaintiff responsible for sexual misconduct.  Paquette conducted his investigation in private and failed to advise Plaintiff of his rights under Georgia Tech's policies.  Paquette refused to allow Plaintiff to be present at his interviews, let alone have an advisor or his attorney attend the interviews.  Moreover, Paquette failed to create audio or video recordings of the interviews or to conduct his interviews in the presence of a court reporter so that a verbatim transcript of the interviews could be prepared. Plaintiff was entitled to these fundamental due process protections given the nature of the charges against him and the fact that Georgia Tech's Student Sexual Misconduct Policy (the "Sexual Misconduct Policy") imposes the academic equivalent of the death penalty by requiring the expulsion of any student who is determined to be responsible for violating the non-consensual sexual intercourse provision of the policy.

9.    Paquette interviewed Plaintiff, Roe, and at least six other witnesses between April 20, 2015 and May 7, 2015.  The witnesses were primarily fellow students.  A couple of the witnesses allegedly observed Roe during the night in question.  The bulk of the witnesses, however, only observed Roe in the days and months after the Incident.  In contrast, Paquette refused to give Plaintiff sufficient time to produce his own witnesses and failed to review a full set of the contemporaneous Facebook messages exchanged by and between Plaintiff and Roe.  Instead, Paquette reviewed the Facebook messages as presented by Roe, who had heavily edited the messages and altered the context of his exchanges with Plaintiff to make it appear that Plaintiff had engaged in misconduct.

10.    Paquette issued a report on behalf of Georgia Tech on May 13, 2015. In that report, Paquette concluded that it was more likely than not that Plaintiff had violated the non-consensual intercourse provision of the Georgia Tech's Sexual Misconduct Policy even though Paquette had commented in his decision "specifically, it is reasonable to believe that based on the nonverbal action of Mr. Roe that John Doe believed he had consent" and also concluded that both Roe and Plaintiff had provided accounts that were credible.

11.    Upon information and belief, Paquette makes no final decision without conferring with and obtaining the approval and consent of Stein.  As such,

while the decision was issued by Paquette, it was, in fact, a decision made by both Paquette and Stein.

12.     Paquette's decision represented just the first step in an odyssey that would place Plaintiff on an emotional roller coaster.   During the ensuing six months, Plaintiff would see Georgia Tech's Appellate Committee reverse Paquette's decision, only to then have Peterson reinstate Paquette's findings and expel Plaintiff in response to an appeal filed by Roe's parents.  Plaintiff then filed a successful appeal with the Board of Regents that resulted in Peterson's decision being vacated and remanded to Georgia Tech for further proceedings.

13.     Upon receiving the remand, Peterson referred the matter to the Appellate Committee that had initially exonerated Plaintiff.  But, in referring the matter to the Appellate Committee, Peterson all but directed that they find in favor of Roe and reinstate the original sanction of expulsion.   It was therefore not surprising that the Appellate Committee reinstated the original sanction of expulsion on November 10, 2015.  Peterson, in turn, upheld Plaintiff's expulsion on November 30, 2015.

14.     Plaintiff filed another appeal with the Board of Regents in early December 2016.  The Board, however, was not expected to act on the appeal for several months.  As a result, Plaintiff feared that he would  be unable to enroll in

classes for the Spring 2016 semester that began on January 11, 2016, and take at least four of the courses that were scheduled to be offered for the last time during that semester due to curriculum changes. Moreover, one of the four courses is a prerequisite to a class that is being offered in the Fall 2016 semester. As a result, Plaintiff was legitimately concerned that he would be unable to graduate from Georgia Tech regardless of the outcome of his appeal unless this Court intervened.

15.    Just days before the Court was scheduled to hear Plaintiff's motion for a preliminary injunction, the Board notified Plaintiff that he was being reinstated as a student at Georgia Tech effective immediately.

16.    Defendants' actions in disciplining Plaintiff were arbitrary and capricious, discriminatory, and based on a lack of evidence. Defendants' decision to reinstate Plaintiff does not obviate the damages that were inflicted on Plaintiff. Defendants have failed repeatedly to adhere to both Georgia Tech's and the Board of Regent's own guidelines and regulations. Moreover, the guidelines and regulations themselves are insufficient to protect the rights of both male and homosexual students. The decision thus represents a discriminatory bias against males, and homosexual males in particular. This discriminatory bias was required for a conclusion of sexual misconduct to be reached and removal ordered given the lack of evidence.

KH373550.DOC                                    8

17.     Georgia Tech appears to have recognized that it has a problem and created an advisory group chaired by the chief legal officer for the Board of Regents, Nels Peterson, in October 2015, which coincidently is the same month that the Board of Regents reviewed Plaintiff's case.  This committee was charged with assessing OSI's procedures and comparing them to those of other schools across the country.   Nevertheless, Defendants proceeded to finalize Plaintiff's expulsion.

18.     Shortly after the Complaint was filed, the committee issued the report attached hereto as Exhibit 1 (the "Nels Peterson Report").  While the Nels Peterson Report noted that the committee did not review the Institute's process for Title IX cases for several reasons, including the fact that the Board of Regents was in the process of promulgating a system wide process, the committee's findings nevertheless have application to the OSI's handling of sexual misconduct cases.

19.     The committee found, for example, that in instances where the parties involved disagreed about what happened, the Georgia Tech Code of Conduct was "insufficiently clear" regarding the investigation process and how the OSI carries out the investigation process.   The committee also found that in at least one instance, the OSI's pre-charge investigation "was one-sided and considered only the complaining student's evidence and evidence of witnesses the complainant

provided." The committee also found that the first failing "was then exacerbated by a second flaw in the process. In that case, OSI's pre-charge investigation was summarized in a report that was then provided as evidence to the student hearing panel."

20.    The committee's concern with providing the report to the hearing panel was that the hearing panel might give inordinate weight to the investigator's findings even though the hearing panel was meant to be an impartial fact finder.

21.    The committee therefore recommended that the Institute's "policy should be amended to require that pre-charge fact investigations, if conducted, talk with all parties and evenhandedly consider evidence submitted by all parties. Moreover, pre-charge investigation reports should not be used as evidence in student panel hearings where facts are in dispute."

22.    The committee also found that the Institute's policies lacked a mechanism by which an accused student can challenge the bias of a hearing officer.

23.    The committee also concluded that the Institute should utilize "a form specifically detailing findings of fact and reasoning for those findings . . . in all cases in which there are disputes of fact, whether the accused student selects a student conduct panel or administrative review."

24.    Plaintiff has been greatly damaged by the Defendants' actions despite his reinstatement:  his graduation has been delayed, the start of his career has been postponed, internship opportunities that would have led to a job in his chosen profession have been lost, his reputation has been damaged, and he was forced to spend significant sums on attorneys to obtain his reinstatement. The impending changes to Georgia Tech's aerospace engineering program made it imperative that Plaintiff resume his studies at Georgia Tech in January 2016.  Time was truly of the essence.  Plaintiff therefore brought this action to obtain relief based on causes of action for, among other things, violations of 42 U.S.C § 1983, Title IX of the Education Amendments of 1972, and state law, and his reinstatement did not render those claims moot.   Since being reinstated, Plaintiff has found that friendships have been severed and he has found it difficult, if not impossible, to participate in his fraternity.  Plaintiff has also found that his participation in the band has been significantly curtailed despite Plaintiff having been prominently involved in that organization prior to his "expulsion."

## **THE PARTIES**

25.    Plaintiff is a natural person, citizen of the United States, and resident of the State of Georgia.  During the events described herein, Plaintiff was a student at Georgia Tech majoring in aerospace engineering, and resided in an off-campus

apartment in the Home Park section of Atlanta while studying at Georgia Tech.

26.    Upon information and belief, defendant Board of Regents has an address of 270 Washington Street, SW, Atlanta, Georgia 30334.  The Board of Regents is an arm of the state government of Georgia and oversees the 30 colleges and universities, including Georgia Tech that comprises the University System of Georgia.    Pursuant to Georgia law, the Board of Regents is the legal entity that must sue, or can be sued, in the place of Georgia Tech.  *See Bd. of Regents of the Univ. Sys. of Ga. v. Doe*, 278 Ga. App. 878, 878 (2006) ("Georgia Tech is not a separate or distinct legal entity from the Board and, therefore, cannot sue or be sued in its own capacity.")    Accordingly, the Board of Regents is the legal entity responsible for the acts and omissions of Georgia Tech giving rise to the causes of action described herein.

27.    Upon information and belief, defendant Peterson resides in the Northern District of Georgia and is the President of Georgia Tech.

28.    Upon information and belief, defendant Stein resides in the Northern District of Georgia, is the Dean of Students and Vice President of Student Life at Georgia Tech, and responsible for overseeing and supervising the Office of Student Integrity and defendant Paquette.

29.    Upon information and belief, defendant Paquette resides in the Northern District of Georgia and was the Assistant Dean of Students and Director of Student Integrity at Georgia Tech when Plaintiff commenced this action. Upon information and belief, Paquette was removed from or resigned his position in late-January or early-February 2016 after the Georgia State Legislature held hearings on the investigation and handling of sexual assault claims at Georgia Tech.

30.    Upon information and belief, defendant Pekowsky resides in the Northern District of Georgia and serves as the Registrar for Georgia Tech.  As Georgia Tech's Registrar, Pekowsky is responsible for, among other things, the oversight of Georgia Tech's record keeping and the registration of students for particular classes.  Pekowsky is named as a defendant solely in her official capacity and to ensure that the Court has the requisite jurisdiction over the appropriate Institute officials to ensure the implementation of any orders that the Court may issue.

31.    Plaintiff and Defendants are sometimes hereinafter collectively referred to as the "Parties."

## JURISDICTION AND VENUE

32.    This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and under 28 U.S.C. § 1367 because:  (i) Plaintiff

states claims arising under the Constitution and laws of the United States, including violations of the due process and equal protection clauses of the United States Constitution as made applicable to the States by the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983 and Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-88; and (ii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

33.    This Court has personal jurisdiction over the Board of Regents and Georgia Tech on the grounds that they are conducting business within the State of Georgia.

34.    This Court has personal jurisdiction over the individual defendants because they reside in and conduct business within the State of Georgia.

35.    This Court has personal jurisdiction over Defendant Peterson on the grounds that he was acting, in part, as an agent of Georgia Tech at all relevant times herein.

36.    This Court has personal jurisdiction over Defendant Stein on the grounds that he was acting, in part, as an agent of Georgia Tech at all relevant times herein.

37.    This Court has personal jurisdiction over Defendant Paquette on the grounds that he was acting, in part, as an agent of Georgia Tech at all relevant times herein.

38.    This Court has personal jurisdiction over Defendant Pekowsky on the grounds that he was acting, in part, as an agent of Georgia Tech at all relevant times herein.

39.    Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because the Board of Regents and Georgia Tech are considered to reside in this judicial district and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

**A. Georgia Tech's Policies and Procedures**

40.    Plaintiff matriculated at Georgia Tech as a freshman in the fall of 2011.  In connection with his enrollment, Plaintiff received a copy of Georgia Tech's Code of Student Conduct (the "Code") and the Institute's Sexual Misconduct Policy (the "Misconduct Policy" and together with the Code, the "Policies").  A copy of the Code is attached hereto as Exhibit 2 and a copy of the Misconduct Policy is attached hereto as Exhibit 3.  The Policies describe Georgia Tech's standards for acceptable conduct and the procedures by which Georgia Tech investigates and adjudicates alleged violations of the Policies.

41.    In consideration for his tuition and attendance at Georgia Tech, Plaintiff received and was given assurances by Georgia Tech that it would follow and comply with the various policies and procedures adopted by the Institute, including the Policies.  These Policies constitute a contractual relationship between Georgia Tech and Plaintiff.

42.    Georgia Tech/the Board of Regents owes its students a duty of care when creating and enforcing standards of conduct.  Yet, Georgia Tech's Policies ignore the longstanding constitutional notion of "innocent until proven guilty" and instead repeatedly refer to the person filing a claim as a "Victim" and witnesses as "Informants."

43.    The Code prohibits certain conduct by Institute students, including conduct in "Violation of the Georgia Institute of Technology Sexual Harassment & Misconduct Policy."

44.    The Code and Sexual Misconduct Policy are intended to work in tandem.  As explained in the Sexual Misconduct Policy, "[t]his policy, in addition, to the Student Code of Conduct, governs the conduct of all Georgia Tech students."

45.    The Sexual Misconduct Policy, as applicable to the claims at issue herein, forbids two forms of sexual misconduct.  The first, "Non-Consensual Sexual Conduct," is defined as "including, but not limited to, intentional and/or forcible touching."  The second, forbids "Non-Consensual Sexual Intercourse," which is defined as "including, but not limited to, anal, oral, or vaginal penetration, however, slight."

46.     The Sexual Misconduct Policy, prohibits "Coercion," which is defined as "[t]he intentional use of force or intimidation (i.e. threats) to obtain compliance for an otherwise unwanted act.  Coercion may be determined by the repetition of the activity beyond what is reasonable, the degree of pressure applied, or environmental factors such as isolation or the initiator's knowledge or incapacitation by alcohol and/or other drugs."

47.     The Code states, "Any person may file a complaint against a Student for violations of the Student Code of Conduct."

> The Code provides that a complaint:
>
> should be submitted as soon as possible after the event takes place or when it is reasonably discovered, no later than thirty (30) business days following the discovery of the incident. Any supporting documentation related to a submitted case should be forwarded to OSI within ten (10) business days of the original submission or OSI may process the case solely on the original complaint.

48.     The Sexual Misconduct Policy, by its own terms, does not govern the process by which complaints are made.  Rather, the Sexual Misconduct Policy states that it "outlines the processes by which [the Institute] will investigate and resolve reports or allegations of Prohibited Conduct."

49.     As a result, Roe had thirty days from the date of the alleged incident to file his complaint.  Yet, Roe failed to file his complaint until nearly one year

later. Roe's delay in coming forward suggests that he had ulterior motives for reporting the incident.

50.    The "Investigation & Resolution Process" contained in the Sexual Misconduct Policy "utilizes an investigatory model, not an adversarial model, in resolving allegations of this policy." The "standard of proof" for determinations of responsibility "shall be Preponderance of the Evidence."

51.    The Sexual Misconduct Policy promises respondents a "prompt, fair, and impartial investigation and resolution" and that "the investigation, resolution, and appeal process [will] be carried out by those who have received annual training on the issues related to . . . how to conduct a sexual misconduct investigation, resolution, and appeal process that protects the safety of Victims, [and] maintains fairness/impartiality for Respondents."

52.    The Sexual Misconduct Policy promises respondents the right "[t]o have the opportunity to provide information regarding his or her involvement in the allegation."

53.    Georgia Tech's Code covenants to provide the following rights to students accused of misconduct:

a. to seek information from a Student Conduct Administrator about the Investigation and Resolution Process;

b. to be informed of the charge(s) and alleged misconduct upon which the charge is based;

c. to be informed of the Information upon which a charge is based and afforded an opportunity to offer a relevant response;

d. to be accompanied by an Advisor of his/her choice;

e. to remain silent with no inference of responsibility drawn;

f. to call and question relevant Witnesses;

g. to present Information in his/her behalf;

h. to be considered not responsible until proven responsible by a Preponderance of the Evidence;

i. to be informed of the outcome of the disciplinary proceeding in writing;

j. to appeal the decision;

k. to waive any of the above rights;

l. to have resolution of the case within a reasonable time.

"Regardless of the final outcome, the Respondent and/or the Victim may file a request for an appeal in accordance with procedures outlined in the Student Code of Conduct, Section G within five (5) business days of the resolution decision."

54.     Pursuant to the Sexual Misconduct Policy, appeals are considered for the following reasons:   "[t]o determine whether the original investigation was conducted fairly and in conformity with prescribed procedures"; "[t]o determine whether there was sufficient evidence to support the decision"; "[t]o determine whether the Sanctions and Supplementary Requirement imposed were appropriate for the violation for which the Student was found responsible"; and/or "[t]o determine whether new Information, not available at the time of the investigation, is relevant to the final decision."

55.     If a respondent or victim appeals, the appeal is to be decided by an Appellate Committee, which consists of the "Dean of Students (or his/her designee), and two trained administrators."

56.     In a section titled "Appeal Decision," the Sexual Misconduct Policy states that the Appellate Committee is authorized to take one of the following actions: (1) "dismiss the appeal for failure to state valid reasons"; (2) "find no error and uphold the original decision"; (3) "uphold the original decision, but modify Sanctions and Supplementary Requirements"; (4) "remand the case to a Student Conduct Administrator"; or (5) "reverse the original decision."

57.     The Sexual Misconduct Policy states that, "[f]or all cases where the sanction includes suspension or expulsion, Victims and/or Respondents may, after

an appeal to the Dean of Students, appeal to the" President of the Institute "via the Vice President for Student Affairs," who "will review and make a recommendation to the" President.   The President's decision is the "final decision of the Institute."

58.    After the appeals process is complete at the Institute, the Board of Regents "is the final appellate authority for all cases of suspension or expulsion."

59.    If a student is found responsible for sexual misconduct and the appeal process is not successful, Georgia Tech makes it impossible for the student to move on.   According to the Sexual Misconduct Policy, "[d]isciplinary records  containing records of Suspension and Expulsion will be permanently retained."   Further, "non-academic misconduct resulting in expulsion is released to third parties  indefinitely."

## B.    Plaintiff and Roe's First Sexual Encounter

60.    Plaintiff and Roe were both members of the Georgia Tech Marching and Pep Bands and the Kappa Kappa Psi fraternity.  Kappa Kappa Psi is known as the Band Fraternity on the Georgia Tech campus.  It was through these activities that Plaintiff and Roe met each other.

61.    Roe is a homosexual male, who upon information and belief had acknowledged his homosexuality at the time of the Incident, as that term is defined below, to his friends in the Band Fraternity.  Roe had not, however, acknowledged his homosexuality at the time of the Incident to his family.

62.    Plaintiff is a bi-sexual male and had openly discussed his sexuality with his friends at the time of the Incident.  Plaintiff had not, however, discussed his sexuality with his parents prior to Roe filing his claim and Georgia Tech bringing charges against Plaintiff.  As a result, Plaintiff was forced to acknowledge his sexuality to his parents in a manner and context that Plaintiff would have preferred to avoid.  As a result, Defendants unfounded actions caused Plaintiff to suffer emotional damage.

63.    Plaintiff and Roe are both members of the Georgia Tech Marching and Pep Bands, as well as the Kappa Kappa Psi fraternity.  It was through these organizations that Plaintiff and Roe first got to know each other, and it was not uncommon for them to spend time together at the "Band Table" during meals.

64.    In early March 2014, Plaintiff ended a serious romantic relationship with his boyfriend.  Plaintiff and his former boyfriend were also roommates at the off-campus apartment in the Home Park section of Atlanta near the Georgia Tech campus.

65.    Approximately two to three weeks after Plaintiff broke up with his boyfriend, Roe told Plaintiff that he needed to speak with him because Roe felt the two men were becoming good friends.

66.    Roe picked Plaintiff up in his car and during a drive around Plaintiff's neighborhood in the Home Park section of Atlanta, Roe told Plaintiff that he had feelings for him and that he wanted to pursue a romantic relationship with Plaintiff.

67.    Plaintiff advised Roe that he was still in the process of getting over his previous boyfriend and was still upset over that breakup.  Plaintiff also told Roe that he did not want to have a relationship with him, and that maybe at some point in the future something could happen, but not now.  After this conversation, Roe dropped Plaintiff off at his apartment.

68.    Plaintiff and Roe continued to hang out with each other in the days and weeks that followed.

69.    In early to mid-April, Roe invited Plaintiff over to a party that was being held at the home of one of Roe's friends.  Roe agreed to serve as the designated driver at this party, so that Plaintiff and Roe's other friends could drink.

70.    At the conclusion of the party, Roe drove home Plaintiff and Roe's other friends.

71.     After dropping his friends off, Roe returned to Plaintiff's apartment where he spent the night in Plaintiff's bed.  The two men engaged in oral sex with each other that evening.

72.     Roe left Plaintiff's house the next morning and continued to hang out together, but did not discuss what had happened that evening or where it would lead.

**C.  The Incident**

73.     Plaintiff and Roe disagree on when the incident at issue in this complaint (the "Incident") occurred.  Plaintiff believes that it occurred during the weekend before final exams, which would have been the weekend of April 26, 2014.  Plaintiff recalls that both he and Roe wanted to hang out again, so Plaintiff invited Roe and some of Roe's friends over to Plaintiff's house, which is located "off-campus" rather than on Institute property.

74.     According to Roe, the Incident occurred on the evening of April 30, 2014, after the Georgia Tech Marching Band conducted its annual finals week "Roving Performance."

75.     At the conclusion of that performance, Roe alleges that he and several of his friends arrived at Plaintiff's home in the Home Park section of the Georgia Tech campus.

76.     April 30, 2014, however, was a Wednesday night that fell during the middle of Georgia Tech's final exam period.  Plaintiff does not recall any of the events described by Roe in his OSI complaint as having occurred on the evening in question, but instead believes that he had a consensual encounter with Roe the weekend prior.  In fact, consistent with that recollection, and his belief that Roe has fabricated a significant portion of his claim, Plaintiff recalls having had a final exam on May 1, 2014, spent the evening of April 30, 2014 studying with a female friend, and would not have been drinking alcohol the night before an exam.

77.     Upon arriving at Plaintiff's home, Roe alleges that he, Plaintiff, and Roe's friends had several drinks containing hard alcohol.  While both men had been drinking, neither one was overly intoxicated.  Moreover, neither man became sick or vomited during the period in question.

78.     While the two men were drinking at Plaintiff's house, they began discussing hooking up again using Facebook's messenger function.  Plaintiff and Roe conferred using a text message system because the two men did not want people to know they were hooking up and relied on Facebook's text messaging

system to communicate.  In particular, Plaintiff did not want his former boyfriend, who was still living in Plaintiff's house, to find out.

79.    Similarly, Roe did not want his friends to know that he was hooking up with Plaintiff.  Roe had not yet acknowledged his homosexuality to his family and many of his friends.  As a result, Roe was apprehensive that his two friends might discover that he was "hooking up" with Plaintiff and that word might in turn get back to Plaintiff's "ex" because one of Roe's friends was the "little brother" or "little" to Plaintiff's ex-boyfriend at their fraternity.

80.    As a result, while Roe and Plaintiff were outside the house, the two men agreed that they would engage in a ruse pursuant to which Roe would go into the house to use the bathroom claiming that he was not feeling well and felt sick. Plaintiff would then come into the house to check on Roe as a way to cover up the fact that they were going to have sex.

81.    As planned, Roe went inside to use the bathroom and a few minutes later, Plaintiff entered the house to "check" on Roe.  Plaintiff does not recall whether he and Roe began kissing once Plaintiff entered the bathroom.  Plaintiff does recall that they subsequently entered Plaintiff's bedroom from the bathroom.

82.    Upon entering the bedroom, the two men began kissing and eventually each man took off his own clothing.  Roe actively participated and demonstrated his consent throughout the evening and morning of the Incident.

83.    During the Incident, the two men performed oral sex on each other on two occasions.  Both instances were clearly consensual.  The first instance occurred shortly after they entered Plaintiff's bedroom, with Roe initiating the act by performing oral sex on Plaintiff, with Plaintiff then reciprocating.  Roe's own actions and words that evening confirmed that Roe was the initiator.  Thus, Roe was the individual responsible for obtaining consent in connection with the Incident.  Moreover, even if one were to assume that Plaintiff was the initiator, the evidence suggests, and Paquette found, that it was reasonable for Plaintiff to believe that he had Roe's consent.

84.    In both instances, the oral sex lasted for approximately fifteen minutes (not counting foreplay) before the recipient ejaculated.  Roe was sufficiently clear minded and aware of what was going on that he even asked Plaintiff whether Plaintiff minded that Roe had a hairy chest.  If Roe had the presence of mind to ask that question, he certainly could not have been intoxicated to the point where he was incapable of consenting.

85.    The second instance of reciprocal oral sex occurred hours later when the two men woke up at approximately 6:00 a.m. after a lengthy period of falling asleep next to each other in Plaintiff's bed.  Upon waking up, each man stimulated the other for approximately fifteen minutes.  It strains credulity to suggest that Plaintiff violated the Sexual Misconduct Policy once again based on Roe being intoxicated.  Roe was never intoxicated to the point of being incapable of consenting, and the passage of time only served to eliminate any argument that the second round of oral sex was influenced by alcohol.

86.    After completing the second round of oral sex, Plaintiff and Roe agreed that Roe should return to the living room so that Roe's friends, who had spent the night on the living room couches, would not get suspicious.  Plaintiff also claimed to Roe's friends the next morning that Roe had fallen asleep in the bathroom the previous evening to avoid raising suspicion about what had really transpired during the Incident.

87.    Plaintiff had every reason to believe that the entire encounter was consensual regardless of whether it occurred on April 30/May 1, 2014 or occurred the previous weekend.  No force was involved and Plaintiff had every reason to believe that everything was consensual.

**D.  The Period After the Incident.**

88.    In the days and weeks that followed, Plaintiff had no reason believe that anything was amiss.  Roe's actions in the months following the Incident support this conclusion, and suggest that his decision to report Plaintiff to the OSI and accuse his of sexual misconduct was the result of Plaintiff's unwillingness to pursue a romantic relationship with Roe and other events that were going on in Roe's life.

89.    For example, Roe rented the duplex next door to Plaintiff's home for the Fall 2014 and Spring 2015 semesters.  Upon information and belief, Roe signed this lease in May 2014.  Thus, shortly after the incident, Roe arranged to rent a house that was literally fifteen feet away from the person who he would accuse almost a year later of sexual misconduct.  Roe stayed in the house for the two semesters encompassed by the lease even though the houses in this neighborhood have a long and successful history of subletting during summer sessions and during the school year.  In fact, Plaintiff was able to sublet his house for the Fall 2015 semester within a matter of days of posting the listing.

90.    At the conclusion of the Spring 2014 semester, roughly one to two weeks after the Incident (depending on whose version of events one believes), Plaintiff left campus for the summer to participate in the competitive marching

band program, Drum Corps International ("DCI").    DCI is an extremely competitive marching band program that features the crème de la crème of marching band participants drawn from across the United States.  In a typical year, perhaps two or three Georgia Tech students will be accepted into the program.

91.    DCI participants travel the country throughout the summer and spend most nights on a bus traveling from one competitive performance location to the next.  Most days are spent in either extensive practice sessions or participating in a scheduled competition.  As a result, there is little time for participants to contact their family and friends.  As a result, Plaintiff did not see or speak with Roe for any extended period of time.  Plaintiff did not become intimate with him again.

92.    Plaintiff's one interaction with Roe during the summer of 2014 occurred when Plaintiff's DCI team traveled to Atlanta for a performance at the Georgia Dome.  Roe not only went out of his way to attend this event, but also left the event early so he could walk more than a mile with a group of friends to where the DCI buses were parked.  Roe's goal was to visit with Plaintiff who was the only Georgia Tech student in DCI that summer that Roe knew.  Yet, Roe told Paquette that he had no contact with Plaintiff during the summer of 2014.

93.    During this meeting, Roe asked Plaintiff why he had not seen heard from him.  Plaintiff told Roe that he had been too busy and barely had time to call

his parents.  Nevertheless, Roe would lie to the OSI during the investigation about whether he had seen Plaintiff during the summer.

94.    Upon returning to the Georgia Tech campus in the fall of 2014, Plaintiff continued to see Roe at Marching and Pep Band practices and performances, at the band table during meals, and at fraternity functions.  Once again, Roe gave no indication that he was feeling uneasy about what had transpired in April 2014.

95.    In December 2014, Roe attended a fraternity retreat in a mountain resort area of Georgia with Plaintiff and approximately ten other people.  The retreat was held in Roe's hometown, and the cabin where the participants stayed was less than four miles from Roe's house.  Yet, Roe spent money to stay in the cabin as opposed to driving each day to the site of the retreat just so he could be closer to and spend more time with Plaintiff.

96.    During the course of the retreat, the participants decided to make a site seeing trip to a waterfall that was approximately a one-hour drive from their cabin.  Roe insisted that Plaintiff ride with him in Roe's car to the waterfall even though a total of three cars were needed to get everyone who attended the retreat to the waterfall.

97.    Pictures from the retreat reflect that Roe was frequently in close proximity to Plaintiff and was obviously having a good time.  In one picture, Plaintiff can be seen lying across Roe's legs.  In another, Plaintiff and Roe can be seen sitting behind each other in the car laughing and having a good time.

98.    During the retreat, Roe once again expressed to Plaintiff his interest in pursuing a romantic relationship.  Plaintiff responded once again by telling Roe that he did not want to engage in a romantic relationship with him.  This time Plaintiff made it clear to Roe that Plaintiff simply did not want to date him as opposed to not being ready to date someone.

99.    Plaintiff and Roe did not talk very often after this conversation, and Plaintiff noticed a change in Roe's attitude toward him.

100.    During the weekend prior to Valentine's Day 20015 (that is, February 7-8, 2015), Roe sent Plaintiff a Facebook message saying that Plaintiff should come "cuddle with him."  Plaintiff responded to Roe by saying once again that he did not want to have a relationship with him.

101.    Roe essentially ceased contact with Plaintiff after this point due to jealousy and the fact that he was clearly a jilted lover.

102.    On February 14, 2015 (Valentine's Day), Plaintiff received a series of messages through Facebook that Roe had previously sent to him.  When Plaintiff

asked what the messages were about, Roe indicated that one of Roe's friends had taken Roe's cellphone and sent the messages.

103.   During this conversation, Plaintiff told Roe that he was drinking, and during that Facebook conversation, Roe asked Plaintiff to delete all of their Facebook message exchanges.

104.   Plaintiff was not sure why Roe was making this request, but nevertheless complied.

105.   Shortly thereafter, Roe blocked Plaintiff on Facebook.

106.   In hindsight, Plaintiff's actions in deleting the Facebook messages would prove to be a mistake.  Roe would subsequently submit radically edited versions of these messages to Paquette in an effort to create the impression that Plaintiff was apologizing for engaging in oral sex with Roe without his consent, as opposed to apologizing for using him as a rebound after Plaintiff's breakup with is boyfriend and for ignoring him after the December 2014 mountain retreat.

107.   Plaintiff's untimely decision to delete the messages in February 2015 and Roe's decision to block Plaintiff on Facebook made it technologically impossible to retrieve the full series of text messages exchanged with Roe.  Upon information and belief, Facebook will not even attempt to recover copies of the

deleted messages unless Facebook is served with a subpoena in the context of a criminal lawsuit.

## E. Roe's Complaint and the OSI Investigation

### (1) Paquette's Investigation

108.  Plaintiff was not aware that Roe had any questions or concerns regarding the Incident until he was summoned to meet with Paquette for the first time on April 20, 2015 -- ten days shy of the first anniversary of the Incident. Paquette advised Plaintiff that Roe had filed a complaint with the OSI on April 15, 2015, alleging Plaintiff had coerced Roe into having sex with Roe while Roe was incapable of consenting because he was intoxicated.

109.  Paquette's investigation would prove to be highly flawed and designed to reach the foregone conclusion that Plaintiff was liable for sexual misconduct.

110.  To that end, Paquette failed to provide Plaintiff with a copy of the Policies, or advise Plaintiff of his rights thereunder.  Paquette also failed to advise Plaintiff, of among other things, the significance of the charges and penalties he was facing if he was found responsible.  Under the circumstances, Defendants should have done more than simply make a passing comment that Plaintiff could bring an advisor with him to his initial meeting.  Similarly, Paquette failed to

advise Plaintiff that Roe's claims were filed almost eleven months after the deadline for filing a claim and were therefore untimely.

111.   Paquette interviewed Plaintiff, Roe, and six additional witnesses, all provided by Roe, between April 15, 2015 and May 7, 2015.

112.   Paquette conducted his interviews *ex parte* even though the credibility of Roe and the other witnesses would be a critical factor in any finding of responsibility.   Moreover, Defendants failed to create either an audio or video recording of his witness interviews or a transcript, which would have allowed Plaintiff to review the same information that Paquette had available to him.

113.   Instead, Paquette provided Plaintiff with written summaries of the interviews as part of Paquette's final report finding Plaintiff guilty of sexual misconduct.   These summaries purport to paraphrase the substance of the witness' statements, but fail to identify the names of the witnesses.   Instead, the witnesses are referred to as Informants 1 through 6.   Paquette's reliance on anonymity further circumscribed Plaintiff's ability to challenge the witnesses' version of events.   This problem was further compounded by Paquette's failure to memorialize the questions he posed to the witnesses and how those witnesses responded to those questions in his witness summaries.

114.   Paquette's witness summaries are filled with contradictory statements, and most of the interviews focused on statements that Roe made to the witnesses months after the events in question.  These statements lack any probative value and are so contradictory that they are impossible to summarize in any coherent manner.  Yet, Paquette used these statements to expel Plaintiff from Georgia Tech.

115.   Paquette also actively took steps to limit Plaintiff's ability to review the statements.  Paquette's final report consists of thirteen single spaced pages that ostensibly summarize the results of Paquette's witness interviews and Paquette's conclusions regarding the investigation.   A copy of Paquette's final report is attached hereto as Exhibit 4.  Paquette presented a draft of that report to Plaintiff during a follow-up meeting with Plaintiff that was held on May 1, 2015 at 9:00 a.m., which was specifically scheduled so Plaintiff could "review [the] report and respond to the charges outlined above."

116.   Paquette failed to provide Plaintiff with a copy of the report prior to his final meeting with Plaintiff.  Paquette also knew that Plaintiff had scheduled a counseling session for 10:00 a.m. that morning in the same building, and would therefore have a limited opportunity to review a report that would recommend Plaintiff's expulsion from Georgia Tech.

117.   As a result, Plaintiff felt compelled to rush through his review of Paquette's report despite the serious nature of the charges against him and the "academic death penalty" he was facing if Paquette found him responsible for the alleged conduct.  Paquette only served to amplify that pressure by standing up from his desk a few minutes before 10:00 a.m. so Paquette could usher Plaintiff out of his office and escort Plaintiff to his counseling session.

118.   In contrast, Paquette re-interviewed Roe on two separate occasions to get Roe's response to Plaintiff's statements and appears to have given Roe an open ended period of time to get his story right.

119.   Ultimately, Paquette's methods ensured that Paquette would be the only person who would ever be able to make a credibility determination with respect to the witnesses' statements.

120.   In further violation of Plaintiff's rights to a fair and impartial proceeding, Paquette refused to give Plaintiff adequate time to identify and present the names of witnesses to OSI.

121.   Moreover, Paquette accepted a series of Facebook messages provided to him by Roe as being a full and accurate representation of a series of messages that had been exchanged between Roe and Plaintiff over a series of many months even though Roe had heavily edited those messages so that the exchange between

the two men would appear to demonstrate Roe's contention that the Incident was non-consensual.

122. Paquette memorialized the results of his investigation in a report entitled "Title IX & Student Sexual Misconduct Policy Final Investigation Report With Outcome" on May 13, 2015 (the "Report").

123. In that Report, Paquette concluded that "both the victim and the respondent provide[d] accounts that are reasonable to believe. Specifically, Paquette concluded that it was reasonable to believe that based on the nonverbal actions of Victim, that Respondent believed he had consent."

124. Yet, Paquette then went on to conclude that "However, the charge of this investigator, however [sic], is to determine if one of the stories is more likely than not." Viewed in context, Paquette's statement evidenced Paquette's belief that his job was to find Plaintiff guilty. Paquette proceeded to do just that despite an egregious lack of evidence to support such a finding. Paquette's actions in this regard would prove to be the first in a never-ending series of arbitrary and capricious decisions that blatantly ignored Paquette's own findings and Georgia Tech's own policies and procedures.

125.    Evidencing a presumption of guilt against Plaintiff from the outset, Paquette repeatedly referred to Roe in his Report as "Victim" and the witnesses as "Informants," while referring to Plaintiff as "Respondent."

126.    Paquette thus went on to write:

> The Georgia Tech Sexual Misconduct Policy states that "It is the responsibility of the initiator, or the person who wants to engage in the specific sexual activity, to make sure that he or she has consent from his or her partner(s)." It is the belief of this investigator that Respondent initiated the sexual activity in his bedroom. In addition, this investigator believes that Victim was very intoxicated which more likely than not deemed him incapacitated and incapable of giving consent. Therefore, it is Respondent's responsibility to have been aware of the signs of incapacitation, which other attendees at the party were also aware of, and not initiate sexual acts with an incapacitated person.
>
> While there was not enough information in the case to determine if Respondent violated the provision on coercion (7), the information in this investigation supports that it is more likely than not that Respondent violated the non-consensual sexual intercourse provision (2).

127.    Based on these findings, Paquette ordered Plaintiff's expulsion.

128.    Paquette's findings, however, were seriously flawed and represented a blatant disregard for the facts that were presented to him and Plaintiff's right to due process.

129.  As noted above, Paquette failed to interview crucial witnesses and generated a report that relied upon numerous instances of hearsay upon hearsay, innuendo, suppositions, and uncorroborated statements to justify Plaintiff's expulsion.  Moreover, Paquette, and the various entities that would hear both Plaintiff's and Roe's subsequent appeals, ignored numerous instances where Roe changed his story or otherwise made inconsistent or uncorroborated statements.

130.  Paquette has testified in other proceedings that when assessing a person's credibility, he gives great weight to whether the person is lying, and in those instances where an accuser or a respondent has lied, he will discount the remainder of his statements.

131.  For example, Roe claimed to Paquette that while eating lunch at the "band table" in the cafeteria with Informants 1 and 2, Plaintiff approached the table and stated that he was planning on getting a fraternity pledge drunk and "up his advances."

132.  Plaintiff repeatedly denied these allegations to Paquette.

133.  Similarly, neither of the two witnesses recalled such a conversation ever taking place.  Both witnesses, however, did recall that Plaintiff was interested in the individual Roe wrongly claimed Plaintiff was seeking to get drunk.

KH373550.DOC                                    41

134.  Nevertheless, when Paquette went to assess Roe's credibility he discounted the fact that Roe made up the conversation that allegedly occurred at the "band table" in February 2015 or what might have motivated Roe to make this specious claim.

## F. The Appeals

### (1) The Appellate Committee

135.  Plaintiff immediately appealed Paquette's decision to the Appellate Committee.

136.  Plaintiff submitted a detailed analysis of Paquette's findings that demonstrated that Paquette's finding was incorrect and that Paquette lacked sufficient evidence to find Plaintiff responsible.

137.  The Appellate Committee considered the parties' submissions, and on June 9, 2015 advised Plaintiff by letter that: "after careful review," Paquette's decision had been "overturned" based on a lack of evidence to support the original decision.  A copy of the Appellate Committee's Decision is attached hereto as Exhibit 5.

138.  The Appellate Committee's decision to "overturn" Paquette's finding meant that the case against Plaintiff had been dismissed and that Plaintiff was no longer considered to be responsible for the alleged conduct.

139.  The Board of Regents' policies, however, provide that either party may file an appeal with Peterson, in his capacity as the Georgia Tech president, within five business days of the Appellate Committee's decision or June 9, 2015.

### (2)  Roe's Parents Appeal to Peterson

140.  On June 17, 2015, Roe's parents filed an appeal with Peterson's office.   The appeal was procedurally improper because (1) the Institute's procedures require the student, rather than the parents, to prepare and file the appeal; and (2) the appeal was filed one day late.

141.  Roe's parents' appeal was not based on any of the four authorized bases for filing an appeal.  Instead, Roe's parent's played on Peterson's emotions, while libeling and slandering Plaintiff in the process, and failed to demonstrate that the Appellate Committee had erred in concluding that Paquette's findings were based on sufficient evidence.

142.  Plaintiff objected to Roe's parents' appeal on the grounds that it was untimely and that they lacked standing to submit it.  Plaintiff also submitted substantial evidence demonstrating that the appeal failed on evidentiary grounds.

143.  Peterson nevertheless opted to consider Roe's parents' appeal, just as Paquette had considered Roe's claim eleven months after such a claim should have

been filed.  There is, however, serious doubt that Peterson reviewed the materials

that were submitted to him by the parties

144.  On July 23, 2015, Peterson advised Plaintiff by letter that he was

reversing the Appellate Committee's decision and reinstating Paquette's original

decision.  A copy of Peterson's July 23, 2015 letter is attached hereto as Exhibit 6.

145.  In explaining his decision, Peterson used what appears to be a

standard form letter, and stated that the Appellate Committee's decision must "be

made based on some compelling reason."   Peterson then wrongly defined the

phrase "compelling reason" as "either the discovery of new information not

previously available that would materially affect the decision, or the failure to

properly follow the governing Institute policies or procedures which resulted in an

improper decision."  Peterson then concluded that "after carefully reviewing the

information provided, [he could] find no compelling reason to change Dean

Paquette's original decision."  As a result, Peterson upheld Plaintiff's expulsion.

146.  Peterson's basis for denying the appeal was wrong.    The Sexual

Misconduct Policy contains **four** bases for appeal:

> •    whether the original investigation was conducted
> fairly and in conformity with prescribed procedures;
>
> •    whether there was sufficient evidence to support the
> decision;

- whether the Sanctions and Supplementary Requirement imposed were appropriate for the violation for which the Student was found responsible; and

- whether new Information, not available at the time of the investigation, is relevant to the final decision.

147.   Had Peterson reviewed the papers submitted by the parties, he would have concluded that the Appellate Committee had properly determined there was a lack of credible evidence to support Paquette's conclusions.

148.   Had Peterson reviewed the papers submitted by the parties, he would have concluded that Roe's appeal did not satisfy the four bases for appeal.  Instead, Peterson would have realized that Roe's parents were engaged in an emotional appeal that ignored the underlying facts.

149.   Peterson, contrary to the Sexual Misconduct Policy, failed to consider whether Paquette's investigation was fair, whether there was sufficient evidence to support the decision, or whether expulsion was an appropriate sanction. Alternatively, Peterson was complicit and a central figure in a Georgia Tech policy that is designed to ensure that all "respondents" to allegations of sexual misconduct are found "responsible" and expelled from Georgia Tech.

150.   Peterson's failure to follow Georgia Tech's Policies was material to his decision to deny Plaintiff's appeal.

151.   Had Peterson reviewed Paquette's investigation or the parties' submissions, he would have found that the investigation was fundamentally unfair. Paquette denied Plaintiff virtually any opportunity to examine the testimony and evidence against him.   Moreover, Paquette sought only evidence to support Roe's claim and refused to look at any evidence or interview any witness that could possibly undermine his pre-conceived decision that Plaintiff should be expelled.

152.   Had Peterson reviewed the evidence to support Paquette's decision, he would have found that it was primarily hearsay upon hearsay upon hearsay that had absolutely nothing to do with Roe's allegations and that there was insufficient evidence to support a finding that Plaintiff had violated the Policies.

153.   Had Peterson reviewed Paquette's investigation and adjudication, he could not have possibly determined that expulsion was an appropriate sanction.

154.   Peterson's decision to expel Plaintiff meant that Plaintiff could not enroll in classes for the Fall 2015 semester and that Plaintiff would lose his on-campus job.

155.   Peterson's decision to expel Plaintiff also meant that Plaintiff was not able to apply for a permanent position with the large private jet company that he

KH373550.DOC                                   46

had interned with during the Summer of 2015. Internships, such as the one that Plaintiff held during the Summer of 2015, are often taken by students during the summer immediately prior to graduation and typically lead to permanent employment positions once the student graduates.

156. Moreover, potential employers in the aerospace industry will question why a student did not return to the company with whom the individual interned. As a result, the gap in Plaintiff's internship/employment history has damaged Plaintiff's career prospects.

**(3)  Plaintiff Appeals to the Board of Regents, Who Vacates Peterson's Decision and Remands the Matter to Peterson For Further Consideration.**

157. Plaintiff immediately appealed Peterson's decision to the Board of Regents.

158. In appealing Peterson's decision, Plaintiff argued that Peterson's definition of a "compelling reason" was wrong and incomplete as a matter of law and contrary to the Board of Regent's policies and procedures.

159. Plaintiff also argued that Peterson had failed to review the Appellate Committee's decision and the underlying submissions of the parties in their entirety, and had he done so, he would have concurred with the Appellate

Committee's conclusion that there was a lack of sufficient evidence to support Paquette's decision to expel Plaintiff.

160.  On October 15, 2015, a committee established by the Board of Regents vacated Peterson's decision and remanded the case to Georgia Tech.  A copy of the Board of Regents' Decision is attached hereto as Exhibit 7.  The Board of Regents did not provide any written explanation regarding the basis for its decision or written instructions on how Georgia Tech was to proceed pursuant to the remand order.

161.  Plaintiff made multiple written and verbal requests to both the Board of Regents and Georgia Tech for a detailed written explanation of the Board of Regent's decision, but the Board of Regents and Georgia Tech failed to provide the requested explanation and related instructions regarding next steps to Plaintiff.  Plaintiff's requests for additional information were met with complete silence.  Plaintiff's numerous telephone calls and emails went unreturned.  The only contact information that Plaintiff received was a statement from Burns Newsome, Georgia Tech's Director of Compliance, Title IX, that Peterson had remanded the remand to the Appellate Committee.

162.  Upon information and belief, the Board of Regents issued verbal instructions related to the remand to Peterson and/or one or more of his

subordinates. The Board of Regents' instructions, however, were not communicated to Plaintiff despite the Board of Regents having a legal obligation to provide Plaintiff with this information. Moreover, Plaintiff's repeated requests for additional information were repeatedly ignored.

163. Upon information and belief, the Board of Regents' had sufficient information in front of them to support an outright reversal of Peterson's expulsion order.

164. When Plaintiff returned to campus for the Fall 2015 semester after his summer internship, he discovered for the first time that his expulsion was still in effect despite the pendency of his appeal to the Board of Regents. Plaintiff learned of this fact when he arrived to attend and participate in a performance of the Georgia Tech Marching Band for "Freshman Convocation." Plaintiff was informed by the Band's Director that Georgia Tech's position was that his expulsion was in effect despite the pendency of his appeal to the Board of Regents.

165. Plaintiff was also effectively terminated from his on-campus job because the employees where Plaintiff worked also had to be enrolled in classes to hold the job.

### (4)    Peterson Effectively Orders the Appellate Committee to Expel Plaintiff

166.    Upon receiving the remand from the Board of Regents, defendant Peterson issued a memo to John M. Stein dated October 29, 2015 advising him of the remand and directing him to remand the appeal to the Appellate Committee for reconsideration under the Appeals provision of the Sexual Misconduct Policy.  A copy of Peterson's memo is attached hereto as Exhibit 8.  Peterson's memo essentially directed Stein and the Appellate Committee to find Plaintiff guilty of sexual misconduct.  To that end, Peterson directed the Appellate Committee to focus on the issue of consent:

> In determining whether there was sufficient evidence to support the initial finding of Non-Consensual Sexual Intercourse the committee should review, among other relevant factors, whether consent was effectively given as required by the Policy:
>
> "Consent" consent means informed, freely and actively given, mutually understandable words or actions which indicate a willingness to participate in mutually agreed upon sexual activity.
>
> Consent is not effectively given if the agreement results from the use of physical force, threats, intimidation, or coercion.  Consent is absent when a person has sexual contact with another when the initiator knew, or reasonably should have known, that the other person(s) is incapacitated.

## What Consent Means

- Consent begins when individuals decide together to do the same thing, at the same time, in the same way, with each other.  It is the responsibility of the initiator, or the person who wants to engage in the specific sexual activity, to make sure that he or she has consent from his or her partner(s).
- Consent to one form of sexual activity does not necessarily imply consent to any other form of sexual activity.
- The initiator must obtain consent at every stage of sexual interaction.
- Consent will exist when both of these standards are met:
  - a reasonable person would consider the words or actions of the parties to have manifested an agreement between them to do the same thing, in the same way, at the same time, with one another; and
  - the Student believed in good faith that the words or actions of the parties to have manifested an agreement between them to do the same thing, in the same way, at the same time, with one another. Consent may never be given by incapacitated persons.
  - Incapacitation refers to the victim's inability to understand the situation, understand the consequences of his/her choices, or to express his/her desires.  This may include, but is not limited to, intoxication, being under the influence of drugs, unconsciousness, or other cognitive impairment, or being under the age of consent in accordance with Georgia state law.

## Additional Clarifying Rules of Consent:

- A person who is the object of sexual aggression is not required to physically or otherwise resist a sexual

aggressor.
- Silence or passivity may not be considered consent; the absence of "No" does not imply consent.
- Previous sexual relationships or the existence of a current relationship with the Respondent does not imply consent.
- Consent cannot be implied by attire, or inferred from the giving or receiving of gifts, money or other items.
- Consent to sexual activity may be withdrawn at any time, as long as the withdrawal is communicated clearly. Withdrawal of consent can be done in numerous ways and need not be a verbal withdrawal of consent.
- The Respondent's intentional use of alcohol/drugs does not excuse a violation of policy.

167.   On November 10, 2015, Newsome advised Plaintiff by letter that the Appellate Committee had reviewed the information submitted by Plaintiff in connection with the remand and had recommended to defendant Peterson that the original decision and sanction entered by Paquette be upheld.   A copy of the Appellate Committee's November 10, 2015 Decision is attached hereto as Exhibit 9.   The Appellate Committee's decision represented a complete reversal of their findings four months earlier and the fact that the Board of Regents had reached a similar conclusion.

### (5)   Peterson Once Again Expels Plaintiff and Essentially Exhausts Plaintiff's Administrative Remedies.

168.   On November 30, 2015, Peterson issued a decision adopting the Appellate Committee's recommendation and upholding Plaintiff's expulsion.   A copy of Peterson's November 30, 2015 decision is attached hereto as Exhibit 10.

169.   Plaintiff filed another appeal with the Board of Regents on December 4, 2015.   The Board of Regents did not have another meeting scheduled in 2015, and was not expected to decide that appeal for several months. In addition, Georgia Tech's Spring 2016 semester was scheduled to begin on January 11, 2016 and  Plaintiff anticipated that the Board of Regents would not decide his appeal until after Georgia Tech's Spring 2016 semester was well underway.

170.   As a result, Plaintiff filed suit on December 15, 2015 and simultaneously filed a motion for a preliminary injunction seeking his reinstatement pending the final disposition of this case.

171.   Plaintiff needs to take seven courses to graduate.  Unfortunately, the Spring 2016 was scheduled to be the last semester in which Georgia Tech offered the following courses because Georgia Tech is in the process of transitioning to a new aerospace engineering curriculum:  AE 3125 (Structures), AE 3051 (Fluids Lab), AE 3145 (Structures Lab), and AE 3021 (High Speed).  The Fall 2016 semester will be the last time that Georgia Tech offers AE 4357 (Senior Design 2).  In addition, successful completion of AE 3125 is a prerequisite to enrolling in AE 4220 (Aeroelasticity), another course that Plaintiff must successfully complete to graduate.  Thus, if Plaintiff was not allowed to resume his studies in

January 2016, he would be unable to complete his undergraduate studies at Georgia Tech regardless of the outcome of this lawsuit. As a result, Plaintiff had for all intents and purposes, exhausted his administrative remedies as he continued to run the gauntlet of the Board of Regents' appeals process.

172.    On January 4, 2016, Plaintiff received a letter from the Board of Regents advising him that his discretionary appeal had been granted and that he was being reinstated immediately.

173.    As a result of Defendants' actions prior to Plaintiff's reinstatement, Plaintiff has been humiliated in front of his peers and had to undergo psychological counseling at Georgia Tech. Plaintiff had to cease his psychological treatment at Georgia Tech because he was not enrolled in the summer semester even though Georgia Tech's policies contemplate that counseling will be made available while the disciplinary process is pending.

174.    As a result of Defendants' actions, Plaintiff's entire academic career could have been ruined but for his ultimate reinstatement-causing great stress as a result. Despite Plaintiff's reinstatement, he has lost a semester of school due to the wrongful expulsion order. Defendants' actions have created a gap on Plaintiff's college transcript that Plaintiff will be forced to explain whenever he applies to graduate school or whenever he applies to a job with an employer that

reviews prospective employee's academic records. In addition, Plaintiff lost valuable internship opportunities due to his "expulsion." These internships typically result in permanent offers of employment.

175. Plaintiff's graduation date has been delayed from May 2016 to December 2016 at the earliest. As a result, Plaintiff will lose no less than seven months of income due to Defendants' wrongful actions and conduct. This delay also means that he will not be graduating with his classmates and that his career progress will inevitably be delayed.

**G. Procedural Violations**

176. Georgia Tech's Policies establish the procedures by which Georgia Tech students who have been accused of violating one or more of the enumerated policies are investigated, heard, and, possibly, disciplined.

177. Defendants violated these Policies in connection with the Investigation and Subsequent appeals, by among other things, failing to provide Plaintiff with a copy of the Policies and a written copy of the charges against him at least five days prior to his initial meeting with Paquette. As a result, Plaintiff was left with insufficient time to prepare for his initial meeting with Paquette.

178.   In addition, if Defendants had complied with Georgia Tech's own policies and procedures, Plaintiff would have known that, among other things, he was entitled, pursuant to the Student Code of Conduct D.3, to:

a. to seek information from a Student Conduct Administrator about the Investigation and Resolution Process;

b. to be informed of the charge(s) and alleged misconduct upon which the charge is based;

c. to be informed of the Information upon which a charge is based and afforded an opportunity to offer a relevant response;

d. to be accompanied by an Advisor of his/her choice;

e. to remain silent with no inference of responsibility drawn;

f. to call and question relevant Witnesses;

g. to present Information in his/her behalf;

h. to be informed of the outcome of the disciplinary proceeding in writing; and

i. to have resolution of the case within a reasonable time.

179.   Had Defendants provided Plaintiff with a copy of the Policies and allowed him to be accompanied by an Advisor, Plaintiff would have known that Roe's charges had not been filed within 30 business days of the discovery of the incident and that Paquette's investigation of the incident was untimely pursuant to section D.1 of the Student Code of Conduct.

180.   Had Defendants provided Plaintiff with a copy of the Policies and allowed him to be accompanied by an Advisor, Plaintiff would have known that Georgia Tech lacked jurisdiction over the claims because the events in question occurred "off campus" and thus fell outside Georgia Tech's jurisdiction, which limits jurisdiction over acts of non-academic misconduct to events that:

> i.  occur on Institute Premises; or
> ii. occur at Institute sponsored activities; or
> iii. occur at Group or Organization Activities; or
> iv. occur off Institute Premises when conduct adversely affects the Institute and/or the pursuit of its objectives.[1]

*See* Student Code of Conduct 4.a.   Had Defendants complied with their own Policies, they would not have attempted to sanction Plaintiff for conduct that occurred "off campus" and thus outside of Georgia Tech's jurisdiction.

---

[1] In contrast, the Student Code of Conduct provides that "instances of academic misconduct relevant to any Institute activity will be addressed regardless of where it may have occurred."  *See* Student Code of Conduct, 4.a.

181.   Defendants violated the Policies by accepting and investigating Roe's claims after the 30-business day deadline for filing a complaint in direct violation of section D.1 of the Student Code of Conduct.

182.   Defendants further violated the Policies by failing to offer Defendant the option of presenting his case to the Student Conduct Panel as contemplated by section 5.b of the Student Conduct Policy.   While Plaintiff believes that the procedures governing the use of the Student Conduct Panel may fail to satisfy the basic due process requirements under Federal and Georgia law, Defendants failure to offer this option to Plaintiff meant that Plaintiff was denied an opportunity to challenge the claims of his accuser and Paquette's witnesses in any manner.

183.   Defendants violated Georgia Tech's policies and procedures and Plaintiff's right to due process by failing to provide Plaintiff with an opportunity to provide character witnesses.

184.   Defendants violated Georgia Tech's policies and procedures and Plaintiff's right to due process by failing to provide Plaintiff with sufficient time to review and respond to Paquette's report.   In Defendants' rush to judgment, Plaintiff was afforded less than one hour on May 1, 2015, to review and respond to a thirteen page single spaced report.   At the conclusion of that hour, Paquette used

Plaintiff's scheduled counseling appointment to rush Plaintiff out of Paquette's office.

185.   Defendants violated Georgia Tech's policies and procedures by failing to give Plaintiff an opportunity to review for accuracy the personal statements that Plaintiff made to Paquette on May 1, 2015.

186.   Defendants violated fundamental notions of due process by failing to maintain an audio or video recording of Paquette's witness interviews, or to have a court report present when the interviews were being conducted.  As a result, it is impossible to verify the summary of the witness statements prepared by Paquette or determine how much "interpretation" Paquette made with respect to those statements.

187.   Defendants violated Georgia Tech's policies and procedures by accepting Roe's appeal to Peterson even though it was filed after the five business day deadline for taking such action was, by Roe's own admission, written by Roe's parents rather than Roe.  Defendants, and Peterson in particular, therefore allowed Roe to violate section G.2 of the Student Code of Conduct.

188.   In an unrelated case, Defendants rejected an appeal letter on the basis that it was not drafted and submitted by a student organization president and instead was drafted by an advisor.

189.   Defendants selectively and inconsistently enforce Georgia Tech's policies and procedures.   Defendants' decision not to enforce Georgia Tech's policies and procedures here and reject the appeal written by Roe's parents was discriminatory and unconstitutional.

190.   Upon information and belief, Defendants violated section G.2 of the Student Code of Conduct because defendant Stein failed provide a detailed recommendation to Peterson regarding why he believed that the Appellate Committee's decision should be reversed and Paquette's decision should be reinstated.   A copy of Stein's recommendation is attached hereto as Exhibit 11.

## H.   Defendants' Failure to Abide by the Preponderance of the Evidence Standard

191.   Defendants have also repeatedly failed to abide by the preponderance of the evidence standard in finding Plaintiff responsible for non-consensual sexual intercourse.   Instead, they have ignored the myriad of facts that suggest that Roe's claims are fabricated and designed to obtain retribution for Plaintiff's unwillingness to engage in a romantic relationship with Roe and Roe's own academic problems at Georgia Tech.

192.   Specific examples, include, but are not limited to, Defendants ignoring the fact that Plaintiff did not have any contact with Roe on April 30, 2014

despite Plaintiff having obtained evidence and witness statements demonstrating that fact.

193.   Defendants ignored Roe's statements that he did not view the Incident as an act of sexual misconduct during the period immediately after the Incident through at least February 2015.

194.   Defendants ignored Roe's repeated efforts, both prior to and after the Incident, to engage Plaintiff in a long-term romantic relationship and sought out ways and opportunities to be in direct contact with Plaintiff.

195.   Defendants ignored the information provided by Informant 2 who advised Paquette that when Roe discussed the Incident with her shortly after it occurred, Roe gave Informant 2 the distinct impression that Roe had welcomed his interaction with Plaintiff and that Roe believed that the Incident was consensual. Roe also made no mention to Informant 2 that he had been sick on the night of the Incident.  Plaintiff never discussed the Incident with Informant 2 before Informant 2 spoke with Paquette or while the investigation was on-going.

196.   Defendants ignored the large gaps and sudden change in tone in the Facebook messages submitted by Roe that clearly demonstrate that Roe had edited the messages to his own advantage.  Read in the proper context, the messages demonstrate the Plaintiff was dealing with a jilted lover in Roe and that Plaintiff

apologized for using Roe as a rebound as opposed to apologizing for engaging in non-consensual sex with him.

197.  To the extent Defendants were provided with Facebook messages exchanged between Plaintiff and Roe, Defendants failed to properly interpret those messages, omitting full sentences to support a conclusion that Plaintiff was intoxicated on the night of the Incident.

198.  Defendants asked each of the witnesses to describe Plaintiff's and Roe's level of intoxication on the night of the incident using a scale of 1 to 10 without providing any context for the witnesses to make the requested interpretation.

199.  Similarly, upon information and belief, Paquette failed to ask the witnesses to try to quantify the amount of alcohol that was consumed by the individuals that were present that evening, including the witnesses.  As a result, Defendants had no way to reconcile one witnesses' statement against another or otherwise validate the witnesses' statements.

200.  Upon information and belief, Paquette failed to establish a time line for the night of Incident that would have allowed him to determine how long Roe claims he was drinking and how long Roe had between his last drink and initiating the sexual acts.

201.   Upon information and belief, Paquette failed to give any credence to Informant 4's statement that Roe stopped drinking around 10:00 p.m. and that everyone went to bed around midnight.   The first sexual encounter occurred at approximately 12:30 a.m.

202.   Defendants ignored the fact that Roe never voiced the fact that he was uncomfortable or wanted to stop sexual contact during the entire Incident and that Roe had the option of leaving Plaintiff's home at any time.

203.   Upon information and belief, Defendants ignored the repeated changes in Roe's story and the overall lack of consistency including the fact that the two witnesses who were allegedly at the "band table" during the alleged February 2015 "band table" incident stated to Paquette that the conversation never occurred.

204.   Defendants improperly relied upon irrelevant information in his report that had nothing to with the question of whether consent was obtained by the person who initiated the sexual contact on the night of the Incident.

205.   Defendants repeatedly ignored the inherent implausibility of Roe's claims that Plaintiff locked him in the bathroom or Plaintiff's bedroom.   Both rooms can only be locked from the inside, and Plaintiff's bedroom has two exits, one of which leads directly outside, while the other leads to the living room.   Roe's

story as to which room he was supposedly locked into has changed on several occasions.  But, if Defendants had given any thought to the claim or looked at the pictures submitted by Plaintiff, it would have been readily apparent that Roe could not have been locked in the bathroom.  When Roe was ultimately challenged on this point at the Appellate Committee level, he admitted that he was lying about being locked in the room and gave the bogus excuse that he felt "emotionally locked in."

206.   Defendants completely ignored the fact that Roe lied when he claimed that he had no contact with Plaintiff during the summer of 2014 despite the fact that Roe went out of his way to see Plaintiff at the Atlanta DCI performance.

207.   Defendants improperly discounted Roe's statements that he attended the mountain retreat despite knowing that Plaintiff would also be in attendance. Roe's explanation that he was still processing what had happened strains credulity. Roe was interested in having a romantic relationship with Plaintiff and was still actively pursuing it.  If Roe had truly been concerned about Plaintiff's actions during the Incident, he would not have attended the retreat.  Similarly, Roe would not have rented the house next door to Plaintiff's.

208.   Defendants similarly ignored the fact that Roe continued to participate in band and fraternity events.  If Roe truly believed that Plaintiff had committed

the acts he was accused of committing, presumably Roe would have avoided going to fraternity events that he knew Plaintiff would be attending and would have switched to the other section of the Pep Band to avoid having to see Plaintiff. Instead, he continued to attend these events in the hope that a romantic relationship with Plaintiff would develop.

209.    Finally, Defendants discounted the fact that Roe, upon information and belief, was on academic probation at Georgia Tech beginning with the Spring 2015 semester.  Georgia Tech's policies allow victims of sexual misconduct to receive a grade of "incomplete" and have failing grades removed from the alleged victim's transcripts.  Moreover, Roe had not acknowledged his homosexuality to his parents until the late-Winter or early-Spring of 2015 after it became obvious to Roe that Plaintiff was not interested in pursuing a romantic relationship.  Roe had previously told Plaintiff that his parents were "God fearing Christians" who would not support his lifestyle.  Roe also told Plaintiff that he was afraid to come out to them.  Roe thus had an incentive to accuse Plaintiff of misconduct in an effort to avoid failing out of Georgia Tech and soften the blow to his parents of his coming out by explaining away his "hook ups" with Plaintiff and failed romantic pursuit by falsely accusing Plaintiff of sexual misconduct.

210.   Given these facts, and Paquette's conclusion that both Roe's and Plaintiff's version of events

## I. The Sanction was Unwarranted and Disproportionate in Light of the Circumstances.

211.   Plaintiff's academic and disciplinary record has been irrevocably and irreversibly tarnished as a result of Defendants' actions despite his ultimate reinstatement.  Plaintiff's academic and disciplinary record will be the subject of intense scrutiny in the event he applies for admission to a graduate school program.

212.   As a result of Defendants' actions, Plaintiff's financial resources were spent paying lawyers to obtain Plaintiff's reinstatement at Georgia Tech. This money could have instead been spent on a graduate or professional school degree.

213.   Without appropriate redress, the unfair outcome of the Defendants' actions will continue to cause irreversible damages to Plaintiff, with no end in sight.  Plaintiff seeks redress from this Court to undo the wrongs occasioned by Defendants on his education and future.

## J.  Events Subsequent to the Filing of Complaint Demonstrate Defendants' Culpability

214.   In addition to the Peterson report described in paragraphs 17 to 23 above, since the filing of the initial complaint, the Georgia House Appropriations

Subcommittee has conducted hearings on whether the Institute was violating the due process rights of students accused of sexual misconduct.

215.   During the course of the hearings, defendants Peterson, Stein, and Paquette testified.

216.   According to published reports in the *Atlanta Journal-Constitution* and other news media outlets, the panel's chairman, State Rep. Earl Ehrhart, blasted Tech's polices as "Kafkaesque" and argued that the Institute and its leadership have placed taxpayers at risk by spurring costly lawsuits.

217.   It was reported in the *Atlanta Journal-Constitution* that the mother of one student who was found to have violated the Institute's polices regarding underage drinking and intimidation testified that Paquette seemed to have pre-determined her son's guilt prior to conducting his investigation.

218.   The mother testified that, incredibly, Paquette blindly and vigorously pursued her son, despite receiving no complaint from the alleged victim.

219.   Other witnesses testified that Paquette and OSI failed to interview witnesses who would back up the accounts of accused students, had dismissed texts and other evidence of innocence as irrelevant, had wrongfully refused to allow the mother of another student to attend her 19-year-old son's sexual misconduct hearing, refused to recognize or consider newly found, exculpatory

evidence on appeal, and hid, until after an initial appeal had already been denied, documents requested by an accused that showed punishment was improper and unwarranted. See Exhibit 12.

220.   At some point in January or February 2016, defendant Paquette either resigned from or was removed from his position.

221.   Subsequent to the hearings, the Georgia Tech student newspaper *The Technique* published several "Op Ed" articles calling for Paquette's resignation and a revamping of the OSI.

222.   Published reports have also called for Peterson to resign.

## CAUSES OF ACTION

### AS AND FOR THE FIRST CAUSE OF ACTION
### Violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution to 42 U.S.C. § 1983
*(Against Defendants Board of Regents, Peterson, Stein, and Paquette in their official capacities for injunctive relief and against Defendants Board of Regents, Peterson, Stein, and Paquette in their personal capacities for money Damages)*

223.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

224.    The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

225.    Fourteenth Amendment due process protections are required in higher education disciplinary proceedings.

226.    A person has a protected liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process.

227.    A person has a protected liberty interest in pursuing his education, as well as in future educational and employment opportunities and occupational liberty, of which he cannot be deprived without due process.

228.    A person who has been admitted to a university, and has paid tuition to that university, has a protected property interest in continuing his education at that university until he has completed his course of study.   The state cannot deprive a person of this interest without due process.

229.    The Board of Regents has promulgated a Policy Manual pursuant to its authority under Article VIII, Section 4, Paragraph 1 of the Georgia Constitution. Under this policy manual, any student who makes satisfactory academic progress and obeys the rules of the institution "has a legitimate claim of entitlement to

continued enrollment." *See Barnes v. Zaccari*, 669 F.3d 1295, 1303-05 & n.9 (11th Cir. 2012) (citing former Policy 401.01, now contained in Policy 4.1.1).

230.   A person has a constitutionally protected liberty interest in his good name, reputation, honor, and integrity.

231.   Plaintiff had a constitutionally protected liberty interest in his good name, reputation, honor, and integrity, and in pursuing his education, as well as in future educational and employment opportunities.

232.   Plaintiff had made satisfactory academic progress and had obeyed all institutional rules when he was wrongly suspended from Georgia Tech.

233.   Under Georgia law, including Board of Regents' Policy 4.1.1, Plaintiff had a constitutionally protected property interest in continuing his education at Georgia Tech.

234.   Plaintiff was entitled to process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he was facing.   The allegations in this case resulted in the harshest sanction available at Georgia Tech, will have lifelong ramifications for Plaintiff, and are quasi-criminal in nature.

235.   Plaintiff was entitled to fundamentally fair procedures to determine whether he was responsible for the alleged sexual assault.

236.  Defendants deprived Plaintiff of his liberty and property interests without affording him basic due process, including, but not limited to, his right to a fair adjudication of Roe's claim.   Rather than investigate what occurred on April 30, 2014, Paquette packed a report with gossip and rumor that was highly prejudicial, based on speculation, and wholly irrelevant.   In so doing, Paquette tainted the findings  themselves and any subsequent review.

237.  Defendants deprived Plaintiff of his liberty and property interests without affording him basic due process, including, but not limited to, his right to question his accuser and other adverse witnesses, the credibility of whom was critical to the finding of responsibility.

238.  No individualized determination was made in this case that Roe, or any other adverse witnesses would have been traumatized by facing questions, directly or indirectly, from Plaintiff.   Moreover, there would have been no apparent burden on Defendants had they provided Plaintiff with this right.

239.  Defendants deprived Plaintiff of his liberty and property interests without affording him basic due process, including, but not limited to imposed a mandatory penalty for those found responsible for non-consensual sexual intercourse to expulsion when other colleges and universities under the control of the Board of Regents allow for the imposition of a lesser penalty.

240.   Paquette conducted *ex parte* interviews of Roe and other adverse witnesses whose credibility was critical to the finding of responsibility as the sole means of conducting his investigation.   Plaintiff was only provided with written summaries of Paquette's interviews instead of either a video or an audio recording of the interviews, or a transcript of them.   These summaries merely purport to paraphrase the substance of the witnesses' statements.

241.   Plaintiff had no way of knowing what questions Paquette asked, the exact responses given to those questions by the adverse witnesses, or the demeanor of those witnesses when they responded to the questions.

242.   No individualized determination was made in this case that Roe or any other adverse witnesses would have been traumatized had Defendants provided Plaintiff with a video, audio recording, or transcript of the interviews.

243.   Defendants would not have been burdened if they had provided Plaintiff with a video recording, an audio recording, or a transcript of the interviews.

244.   Plaintiff was not given the names of the witnesses against him.  Instead, Paquette's report refers to the witnesses as "Informants" 1 through 6.

245.   Paquette did not share with the Plaintiffs the statements he obtained from the various witnesses until his final interview with Plaintiff at 9:00 a.m. on May 1, 2015.

246.   Paquette knew that Plaintiff had an appointment with Georgia Tech's psychological counseling office scheduled for 10:00 a.m. on May 1, 2015 and that Plaintiff would therefore have a limited amount of time available to review the witness' statements.

247.   No individualized determination was made in this case that Roe or any other adverse witnesses would have been traumatized had Defendants provided Plaintiff with the names of the witnesses or copies of Paquette's witness summaries in advance of his final interview.  The burden on the Defendants would not have been increased had they provided Plaintiff with copies of the witness statements in advance.

248.   Plaintiff was not shown the evidence that Paquette relied on during his investigation until his final interview.

249.   No individualized determination was made in this case that Roe or any other adverse witnesses would have been traumatized had Defendants provided Plaintiff with an adequate opportunity to examine this evidence in advance of his

final interview.    Moreover, there would have been no apparent burden on Defendants to have done so.

250.   Defendants' procedures denied Plaintiff the opportunity to effectively defend himself by challenging these witnesses' assertions.

251.   Defendants have a custom and practice of disregarding and violating students' constitutional right to question adverse witnesses where credibility is essential to the outcome, or to, at the very least, be provided with an exact record of adverse witness interviews in such a case.  As a result, Defendants failed to provide Plaintiff with the basic due process protections that they are require to provide students accused of quasi-criminal sexual misconduct.

252.   No individualized determination was made in this case that providing a fair and impartial adjudicator would have imposed a great burden on Defendants.

253.   Judge Steve Jones in deciding a motion for a preliminary injunction in a similar case involving the same core group of defendants concluded that Paquette's testimony regarding the course of his investigation in that case and the manner in which Paquette made certain investigative decisions was very far from an ideal representation of due process.  *See Doe v. The Board of Regents of the University System of Georgia, 1:15-cv-04079-SCJ,* Decision dated December 16, 2015 at 37-38.

254.   Judge Jones further noted that much remains for his court's consideration as to whether Paquette's investigation veered so far from the ideal as to be unconstitutional.  *Id.*

**Paquette utilized the same methods and techniques in this case to the ones that he employed in the case pending before Judge Jones.**

255.   Defendants, as well as other agents, representatives, and employees of Georgia Tech were acting under color of state law when they showed intentional, outrageous, and reckless disregard for Plaintiff's constitutional rights.

256.   Defendants all agreed to, approved, and ratified this unconstitutional conduct.

257.   As a result of these due process violations, Plaintiff was expelled and suffers ongoing harm, including to his reputation and numerous damages as a result. He is unable to enroll in Institute courses, is unable to transfer to another comparable undergraduate institution because of the erroneous disciplinary finding labeling him as having committed sexual assault, information that is almost certain to be provided to any educational institution to which he applies in the future. Even if he could transfer to another undergraduate institution, it would likely not offer the courses that he is required to take in order to complete his engineering degree.

258.   Accordingly, Defendants are all liable to Plaintiff for violations of the Due Process Clause of the Fourteenth Amendment, and for all damages arising therefrom.

## AS AND FOR THE SECOND CAUSE OF ACTION
## BREACH OF CONTRACT
*(Against defendant Board of Regents)*

259.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

260.   Plaintiff paid Georgia Tech money for his education, and in return, the Georgia Tech contracted to give Plaintiff access to its undergraduate degree program.

261.   The relationship between Plaintiff and Georgia Tech is contractual in nature, and each party owes the other certain duties, some of which can be found in the Code and Student Sexual Misconduct Policy.

262.   Georgia Tech breached its contract with Plaintiff by failing to provide him with a "fair" investigation and adjudication of Plaintiff's claim, as the Sexual Misconduct Policy requires.   Paquette sought out rumors and gossip regarding Plaintiff's character during his investigation and, no matter how irrelevant, he stuffed it into his report so that any subsequent review of his decision would be fatally tainted.

263.    Based on the aforementioned facts and circumstances, Defendant Board of Regents breached express and/or implied agreement(s) with John Doe.

264. Defendant Board of Regents committed several breaches of its agreements with John Doe during the investigation and hearing process.  A non-exhaustive list of Board of Regents breaches include the following:

a.    Defendants advise Plaintiff of his rights under the Policies as more fully described above;

b.    Defendants refused to allow Plaintiff to participate in the interview process upon which his expulsion was based;

c.    Defendants failed to provide Plaintiff with the names of the witnesses against him and provide him with a an audio or video recording of those interviews so that he could effectively challenge what was said by those witnesses;

d.    Defendants failed to offer Roe the opportunity to present his case to the Student Conduct Panel as contemplated by section 5.b of the Student Conduct Policy;

e.        Defendants conducted an investigation of Roe's claims and subsequently expelled Plaintiff despite the fact that Roe's claims were filed beyond the 30 business day deadline for filing such claims;

f.        Defendants accepted for filing and decided Roe's appeal to defendant Peterson even though it was filed after the deadline for filing such an appeal;

g.        Defendants accepted for filing and considered Roe's appeal to defendant Peterson even though the appeal was prepared by Roe's parents rather than Roe; and

h.        Defendants failed to provide Plaintiff with any information regarding the basis for the Board of Regents decision to vacate and remand Peterson's decision, which in turn prevented Plaintiff from being able to defend himself in the proceedings that occurred after the remand.

265.   As a direct and proximate result of this breach, Plaintiff was erroneously found responsible for non-consensual sexual intercourse causing him to suffer the harms described above.

266.   Plaintiff's reinstatement by the Board of Regents does not obviate the damages that he suffered due to his erroneous expulsion.

267.   Georgia Tech breached its contract with Plaintiff by accepting Roe's complaint beyond the 30 days permitted by the Code and failing to abide by the procedures in the Sexual Misconduct Policy regarding appeals, including but not limited to, accepting Roe's appeal to Peterson after the five business day deadline and by allowing Roe's parents to prepare the appeal.   As a direct and proximate result of this breach, Plaintiff was erroneously found responsible for non-consensual sexual contact, causing him to suffer the harms described above.

268.   Defendants' breach of contract has caused Plaintiff damages that include, but are not limited to, the damages he has suffered due to the delay in his graduation stemming from his erroneous expulsion, attorney's fees, severe harm to his reputation, and other direct and consequential damages.

## AS AND FOR A THIRD CAUSE OF ACTION
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
### *(Against Defendant Board of Regents)*

269.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

270.   Every contract contains within it an implied covenant of good faith and fair dealing.

271.   Georgia Tech breached that covenant by focusing its investigation of Roe's claim on Plaintiff's character, rather than on what allegedly occurred between Roe and Plaintiff on April 30, 2014.  As a direct and proximate result of this breach, Plaintiff was erroneously found responsible for non-consensual sexual intercourse, causing him to suffer the harms described above.

272.   Georgia Tech breached that covenant by failing to allow Plaintiff to submit questions to be posed to Roe and other adverse witnesses.   As a direct and proximate result of this breach, Plaintiff was erroneously found responsible for non-consensual sexual intercourse, causing him to suffer the harms described above.

273.   Georgia Tech breached that covenant by refusing to provide Plaintiff with a video or audio recording or exact transcripts of Paquette's interviews of Roe and other adverse witnesses.   As a direct and proximate result of this breach,

Plaintiff was erroneously found responsible for non-consensual sexual intercourse, causing him to suffer the harms described above.

274.   Georgia Tech breached that covenant by refusing to provide Plaintiff with the names of the witnesses or the evidence relied upon by Paquette and providing Plaintiff with no opportunity to defend himself.  As a direct and proximate result of this breach, Plaintiff was erroneously found responsible for non-consensual sexual contact causing him to suffer the harms described above.

275.   Georgia Tech breached that covenant by refusing to interview witnesses Plaintiff proposed.    As a direct and proximate result of this breach, Plaintiff was erroneously found responsible for non-consensual sexual contact causing him to suffer the harms described above.

276.   Georgia Tech breached that covenant by pursuing the investigation and adjudication of the charge against Plaintiff in an unfair and biased manner.

277.   Defendants' breach of the covenant and resulting breach of contract has caused Plaintiff damages that include, but are not limited to, the damages he has suffered due to the delay in his graduation stemming from his erroneous expulsion, attorney's fees, severe harm to his reputation, and other direct and consequential damages.

## AS AND FOR THE FOURTH CAUSE OF ACTION
## ESTOPPEL AND RELIANCE
*(Against Board of Regents)*

278.  Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

279.  The Board of Regent's policies constitute representations and promises that the Board of Regents should have reasonably expected to induce action or forbearance by Plaintiff.

280.  The Board of Regents expected or should have expected Plaintiff to accept its offer of admission, incur tuition and fees expenses, and choose not to attend other colleges based on its express and implied promises that the Board of Regents would not tolerate, and Plaintiff would not suffer, harassment by fellow students and would not deny Plaintiff his procedural and contractual rights should he be accused of a violation of the Board of Regents' policies.

281.  Plaintiff reasonably relied to his detriment on these express and implied promises and representations made by the Board of Regents.

282.  Based on the foregoing, the Board of Regents is liable to Plaintiff based on Estoppel.

283.  As a direct and proximate result of the above conduct, Plaintiff has suffered damages that include, but are not limited to, the amount of all his tuition

payments, the lost value of the degree for which he contracted, attorney's fees, the lost value of future earnings, severe harm to his reputation, and other direct and consequential damages.

284.  As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## AS AND FOR THE FIFTH CAUSE OF ACTION
## NEGLIGENCE
*(Against defendants Board of Regents, Peterson, Stein, and Paquette)*

285.  Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

286.  Defendants Board of Regents, Peterson, Stein, and Paquette owed duties of care to Plaintiff.  Such duties included, without limitation, a duty of reasonable care in the conduct and investigation of the allegations of sexual misconduct against him.

287.  These Defendants were negligent in finding Plaintiff culpable of sexual misconduct, in light of the record of evidence:  Plaintiff and Roe were both drinking, but were not incapacitated.  Both men removed their own clothes and kissed each other.  Each man performed consensual oral sex on the other on two occasions that evening/morning.

288.    These Defendants were negligent in failing to employ neutral, impartial or properly trained student conduct board members to adjudicate allegations of the utmost serious nature, namely, sexual misconduct, being alleged against Plaintiff and leading to his expulsion.

289.    The Board of Regents breached its duties owed to Plaintiff.

290.    As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational opportunities, economic injuries and other direct and consequential damages.

291.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

### AS AND FOR THE SIXTH CAUSE OF ACTION
### NEGLIGENCE PER SE
*(Against defendant Board of Regents)*

292.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

293.    The United States Department of Education's Office for Civil Rights ("OCR") publishes guidance designed to ensure that schools receiving federal

funding comply with Title IX.  Administrative regulations can form the basis of a claim of negligence per se.

294.  OCR requires schools to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student and employee sex discrimination complaints."   Implicit in the requirement to publish such procedures is the requirement to actually implement them.

295.  OCR requires schools to engage in "prompt, thorough, and impartial" investigations of allegations of sexual misconduct.

296.  OCR requires that the "rights established under Title IX must be interpreted consistently with any federally guaranteed due process rights."

297.  OCR requires schools to use a preponderance of the evidence standard in making determinations of responsibility for claims of sexual misconduct.

298.  OCR requires campus officials involved in implementing the school's grievance procedures to be properly and regularly trained in, or have experience with, both the handling of sexual misconduct complaints and the school's investigation and adjudication procedures.   This includes training in evaluating witness credibility and weighing evidence impartially.

299.  These OCR requirements are meant to protect all parties in sexual misconduct disciplinary proceedings.    Plaintiff, as a respondent in a sexual

misconduct disciplinary proceeding, falls within the class of people protected by OCR guidance and, more generally, Title IX.

300.    The College breached at least the following duties owed to Plaintiff as proscribed by OCR:

- The duty to abide by the school's published policies and procedures regarding sexual misconduct;

- The duty to afford an impartial process with an equitable resolution;

- The duty to implement its OCR-compliant policies and procedures consistently with federally guaranteed due process rights, and in particular the duty to allow for cross-examination when a student faces suspension or expulsion for disciplinary reasons; and

- The duty to properly train campus officials who implement and participate in the school's sexual misconduct grievance procedures.

301.    The breaches described above violated both OCR guidance, the Board of Regents' and Georgia Tech's own policies and procedures.

302.    As a direct and proximate result of the Board of Regents' and Georgia Tech's negligence, carelessness, and gross breach of due care, Plaintiff has been seriously and irreparably damaged in the following ways, among others: Plaintiff has endured extreme emotional and psychological suffering; his graduation from the Institute has been delayed, the start of his career has been delayed, and the gap in his

academic record will raise questions in the event Plaintiff applies to graduate school or a

potential employer requests a copy of his transcript; and he will suffer a permanent

reduction in lifetime earnings as a result of the delay in the start of his career.

303.   Accordingly, the Board of Regents is liable to Plaintiff for negligence

per se and for all damages arising out of that violation.

**AS AND FOR THE SEVENTH CAUSE OF ACTION**
**VIOLATION OF TITLE IX (20 U.S.C. § 1681)**
*(Against Defendant Board of Regents)*

304.   Plaintiff incorporates by reference all of the preceding paragraphs of

this Complaint as though fully set forth herein.

305.   Georgia Tech receives federal funding, including in the form of federal

student loans given to students.

306.   Because it is a recipient of federal funding within the meaning of the

statute, Georgia Tech is subject to the requirements of Title IX.

307.   Title IX prohibits gender discrimination in the education setting.

308.   The procedural flaws in Georgia Tech's investigation and adjudication

of Roe's claim against Plaintiff, as well as the evidentiary weaknesses underlying

Georgia Tech's decision, cast serious doubt on its finding of responsibility.   Both

the procedural flaws in the investigation and the particular circumstances

surrounding the investigation and adjudication of Roe's claim against Plaintiff

show that gender was a motivating factor in Georgia Tech's erroneous decision to find Plaintiff responsible and expel him.

308.    The procedural flaws in Georgia Tech's handling of Roe's claim against Plaintiff include:

- The failure to permit Plaintiff to submit questions to be asked of Roe and the other adverse witnesses.

- The failure to give Plaintiff either a video or an audio recording or exact transcript of the investigative interviews of Roe and other adverse witnesses.

- The failure to give Plaintiff the names of the witnesses against him.

- The failure to ask Plaintiff for the names of any witnesses that Plaintiff believed had information relevant to the case.

- The failure to give Plaintiff the evidence relied upon in the adjudication of Roe's complaint until his final meeting with Paquette.

- Paquette never asked Plaintiff to provide him with the names of potential witnesses.

309.    Paquette's investigation as to whether Plaintiff committed sexual assault was cursory.

310.    The Institute initiated its investigation in the shadow of a national story that focused on Georgia Tech's male-dominated culture.    In light of the scrutiny

related to that story, Georgia Tech took aggressive steps to impose discipline on male students and male-only organizations.

311. OSI in particular has targeted male students and male-only organizations—and it has engaged in a pattern of unfair investigations and adjudications resulting in serious sanctions. Georgia Tech has not made comparable efforts with respect to female students.

312. Georgia Tech—where male students outnumber females by approximately a 3-to-2 ratio—has been under intense scrutiny since October 2013 regarding masculine culture on its campus and, in particular, the allegedly misogynistic behavior of its fraternities.

313. In the context of the Institute's reaction to this scrutiny, it is inescapable that Plaintiff's gender was a motivating factor in the decision to expel him.

314. In October 2013, a Georgia Tech fraternity's e-mail, with the grotesque title "Luring Your Rapebait," sparked national outrage over misogyny and rape culture on campuses and in fraternities in particular. The e-mail, which came from the fraternity's social chair, contained, among other things, a seven-step guide to "hooking up," with advice like "[i]f anything ever fails, go get more alcohol" and "send them out of your room when you are finished."

315.   Georgia Tech immediately opened up an investigation of the fraternity and, a few months later, found the chapter responsible for numerous Code of Conduct violations, including "a pattern of sexual violence" that suggests a "deep-rooted culture within the fraternity that is obscene, indecent, and endangers women."   The Institute suspended the fraternity for three years.  According to news reports, Georgia Tech also began taking widespread action.   The school rewrote its Sexual Misconduct Policy.  In addition, an April 18, 2015, investigative report by *The Atlanta Journal-Constitution*, titled *Secretive Justice: How Georgia colleges handle rape on campus*, revealed that the school had adopted procedures that limited the rights of accused more than any other large Georgia university.

316.  *The Atlanta Journal-Constitution* made clear that Georgia Tech imposed a mandatory penalty of expulsion on any student found responsible for non-consensual sexual intercourse, and that other colleges and universities under the umbrella of the Board of Regents authorized lesser penalties for similar offenses.

317.  *The Atlanta Journal-Constitution* made clear the impact of the steps taken by the Institute:  "***The students accused at Georgia Tech were almost always found responsible***."   John Davis & Shannon McCaffrey, *Secretive Justice: How*

*Georgia Colleges Handle Rape on Campus*, Atlanta Journal-Constitution, Apr. 18, 2015 (emphasis added).

318.  In fact, according to a January 16, 2016 article published by the *Atlanta Journal Constitution* entitled "Wrongly Accused of Rape:  Students Question Their Expulsion from Tech," Plaintiff is the only student in the last five years to have been reinstated by the Board of Regents.   That same article indicated that at least 12 students, including Plaintiff, had been suspended or expelled during that same time period.

319.  In light of the scrutiny that Georgia Tech has faced regarding misogynistic behavior, OSI has established a pattern of investigating and adjudicating claims against male students and organizations:  predetermine guilt, refuse to consider evidence that could support the male respondents, and exhibit overwhelming bias in favor of the accuser.

320.  OSI has also endorsed statements by sociologist Michael Kimmel that reveal gender as a motivating factor behind Georgia Tech's actions.   OSI has assigned Mr. Kimmel's book, Guyland, to male students it has disciplined.   Mr. Kimmel writes in the book, among other things, that male student athletes and fraternity members have certain characteristics that make them prone to commit

sexual assault.  The endorsement of the book, <u>Guyland</u>, indicates that gender was a motivating factor behind Paquette's unfair and biased investigation of Plaintiff.

321.   Unlawful gender discrimination also occurs when a university subjects a student to a disciplinary process that has a disparate impact on members of that student's gender.

322.   The procedural protections afforded respondents in sexual misconduct proceedings by Georgia Tech are unfair and inadequate.

323.   Georgia Tech's insistence on expelling any student found responsible for non-consensual sexual intercourse, when other colleges and universities administered by the Board of Regents can impose lesser penalties, is unfair and inadequate.

324.   Sexual misconduct violations are more likely than others to result in the most severe sanctions Georgia Tech may impose.   That is exactly what happened here.   Defendants compounded the problem by giving Plaintiff the harshest possible sanction without a meaningful opportunity to defend himself.

325.   Claims of sexual misconduct, more often than others, are decided solely or primarily based on the parties' credibility, because sexual contact typically takes place in private.

326.   Upon information and belief, the vast majority of respondents in Georgia Tech's sexual misconduct investigations and disciplinary proceedings are male.

327.   The endorsement of the book, <u>Guyland</u>, indicates that gender was a motivating factor behind Paquette's unfair and biased investigation of Plaintiff.

328.   Unlawful gender discrimination also occurs when a university subjects a student to a disciplinary process that is selectively enforced so that charges are only against male college students.

329.   The procedural protections afforded respondents in sexual misconduct proceedings by Georgia Tech are unfair and inadequate.

330.   Sexual misconduct violations are more likely than others to result in the most severe sanctions Georgia Tech may impose.   That is exactly what happened here.   And even worse, Plaintiff was given the harshest possible sanction without a meaningful opportunity to defend himself.

331.   Claims of sexual misconduct, more often than others, are decided solely or primarily based on the parties' credibility, because sexual contact typically takes place in private.

332.   The vast majority of respondents in Georgia Tech's sexual misconduct investigations and disciplinary proceedings are male.

333.   Respondents charged with Sexual Misconduct at Georgia Tech are historically and systematically discriminated against.

334.   Georgia Tech's inadequate sexual misconduct procedures therefore have a disparate impact upon male students.   Georgia Tech knows that, yet is deliberately indifferent to it.

335.   Georgia Tech's inadequate and unfair procedures directly and proximately prevented Plaintiff receiving a fair process.

336.   Accordingly, Georgia Tech is liable to Plaintiff for violation of Title IX and for all damages arising out of that violation.

**AS AND FOR THE EIGHTH CAUSE OF ACTION**
**VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE**
**FOURTEENTH AMENDMENT TO THE UNITED STATES**
**CONSTITUTION**
**PURSUANT TO 42 U.S.C. § 1983**
*(Against Defendants Peterson, Stein, and Paquette in their official capacities*
*for injunctive relief; and against Defendants Peterson, Stein, and Paquette*
*in their personal capacities for money damages)*

337.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

338.   The Fourteenth Amendment to the United States Constitution prohibits gender discrimination unless it is substantially related to an important governmental interest.

339.   For the reasons set forth in Count I above, there is a permissible inference that Georgia Tech discriminated against John Doe based on his gender and/or his sexual preference.

## AS AND FOR THE NINTH CAUSE OF ACTION
## VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION
## PURSUANT TO 42 U.S.C. § 2000e-2

*(Against Defendants Peterson, Stein, and Paquette in their official capacities for injunctive relief; and against Defendants Peterson, Stein, and Paquette in their personal capacities for money damages)*

340.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

341.   Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000e-2, prohibits discrimination in employment on the basis of, among other things, sex and sexual orientation.

342.   Because Plaintiff was improperly expelled from Georgia Tech due to his male gender and sexual orientation and was no longer a student at Georgia Tech, Plaintiff lost his on-campus job.

343.   Defendants' actions therefore constitute a violation of 42 U.S.C. § 2000e-2.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff demands judgment against Defendants as follows:

(i)     on the first cause of action for violation of due process clause of the United States Constitution as made applicable to the States pursuant to the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(ii)     on the second cause of action for breach of contract, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional damages, damages to reputation, past and future economic losses, loss of educational and musical opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iii)   on the third cause of action for breach of the covenant of good faith and fair dealing, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional damages, damages to reputation, past and future economic losses, loss of educational and musical opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv)   on the fourth cause of action for estoppel and reliance, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional damages, damages to reputation, past and future economic losses, loss of educational and musical opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(v)   on the fifth cause of action for negligence, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional damages, damages to reputation, past and future economic losses, loss of musical opportunities,

and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vi)    on the sixth cause of action for negligence per se, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional damages, damages to reputation, past and future economic losses, loss of musical opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vii)   on the seventh cause of action for violations of Title IX of the Education Amendments of 1972, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional damages to reputation, past and future economic losses, loss of educational and musical opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(viii)  on the eighth cause of action for violation of equal protection clause of the United States Constitution as made applicable to the States pursuant to the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983, a judgment awarding Plaintiff damages in an amount to be

determined at trial, including, without limitation, damages to physical well-being, emotional damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(ix)    on the ninth cause of action for violations of 42 U.S.C. § 2000e-2, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(x)    awarding Plaintiff punitive damages for the conduct described herein; and

(xi)    awarding Plaintiff such other and further relief as the Court deems just, equitable, and proper.

## JURY DEMAND

Plaintiff herein demands a trial by jury of all issues so triable in the present matter.

**Dated: Atlanta, Georgia**
**March 17, 2016**

/s/ *Jonathan E. Hawkins*

**Jonathan E. Hawkins**
**Georgia Bar No. 338779**
**hawkins@khlawfirm.com**
**Christopher E. Adams**
**Georgia Bar No. 789600**
**adams@khlawfirm.com**

**KREVOLIN & HORST, LLC**
**1201 W. Peachtree Street, N.W.**
**Suite 3250, One Atlantic Center**
**Atlanta, GA 30309**
**(404) 888-9700**
**(404) 888-9577 (facsimile)**

**-and-**

**Andrew T. Miltenberg, Esq.**
**(motion for admission** *pro hac vice*
 **to be filed)**
**Jeffrey S. Berkowitz, Esq.**
**(motion for admission** *pro hac vice*
**to be filed)**
**Nesenoff & Miltenberg, LLP**
**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**(212) 736-4500**
**amiltenberg@nmllplaw.com**
**jberkowitz@nmllplaw.com**

*Attorneys for Plaintiff John Doe*

## VERIFICATION

I, ███████████ pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury, that the foregoing Verified Amended Complaint is true and correct to the best of my knowledge, information, and belief.

March 17, 2015



## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1D, the undersigned counsel certifies that the foregoing document has been prepared in accordance with one of the font and point selections approved by the Court in L.R. 5.1B. This pleading has been prepared using Times New Roman font (14 point).

This 17th day of March, 2016.

/s/ *Jonathan E. Hawkins*
Jonathan E. Hawkins
Georgia Bar No. 338779
hawkins@khlawfirm.com
Christopher E. Adams
Georgia Bar No. 789600
adams@khlawfirm.com

KREVOLIN & HORST, LLC
1201 W. Peachtree Street, N.W.
Suite 3250, One Atlantic Center
Atlanta, GA 30309
(404) 888-9700
(404) 888-9577 (facsimile)

## **CERTIFICATE OF SERVICE**

I hereby certify that on this day I electronically filed the within and foregoing with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to all attorneys of record.

This 17th day of March, 2016.

/s/ *Jonathan E. Hawkins*
Jonathan E. Hawkins
Georgia Bar No. 338779
hawkins@khlawfirm.com
Christopher E. Adams
Georgia Bar No. 789600
adams@khlawfirm.com

KREVOLIN & HORST, LLC
1201 W. Peachtree Street, N.W.
Suite 3250, One Atlantic Center
Atlanta, GA 30309
(404) 888-9700
(404) 888-9577 (facsimile)

KH373550.DOC                    104